No. 58,052

STATE OF KANSAS, *Appellee,* v. THOMAS R. McNAUGHT, *Appellant.*

(713 P.2d 457)

568

Opinion filed January 17, 1986.

*Mark L. Bennett, Jr.,* of Marshall, Davis, Bennett & Hendrix, of Topeka, argued the cause, and *Wilburn Dillon, Jr.,* of Tilton, Dillon, Beck & Crockett, of Topeka, was with him on the briefs for appellant.

*Arthur R. Weiss,* assistant district attorney, argued the cause, and *Robert T. Stephan,* attorney general, and *Gene M. Olander,* district attorney, were with him on the brief for appellee.

The opinion of the court was delivered by

PRAGER, J.: This is a direct appeal by the defendant, Dr. Thomas R. McNaught, from jury convictions of vehicular homicide (K.S.A. 21-3405), a class A misdemeanor, and driving under the influence of alcohol (DUI) (K.S.A. 1984 Supp. 8-1567), a class A misdemeanor. The defendant was acquitted of involuntary manslaughter (K.S.A. 1984 Supp. 21-3404), leaving the scene of an injury accident (K.S.A. 8-1602), failure to render aid (K.S.A. 1984 Supp. 8-1604), and failure to report an injury accident (K.S.A. 1984 Supp. 8-1606). Following the convictions, the trial court imposed sentences on each count and the defendant appealed.

This case arose out of a tragic automobile accident which occurred on July 29, 1984, at about 8:32 p.m. on Northwest 46th Street north of the city of Topeka in Shawnee County. Just prior to the accident, Kathleen (Kathy) Bahr was riding a bicycle in a westerly direction. The bicycle was struck in the rear by an automobile driven by the defendant in a westerly direction on 46th Street. The evidence showed that, following the impact, Kathy Bahr's body struck the hood of defendant's vehicle, breaking the right side of the windshield, and she was then thrown over the back of the car. The bicycle became attached to

the front side of the defendant's vehicle. Defendant testified that, just prior to the accident, he had stopped at 46th Street and Rochester Road and then proceeded west on 46th Street with his cruise control set at 50 to 55 miles per hour which was within the posted speed limit. He testified that looking ahead he could see no objects when suddenly there was a bang on his windshield. He thought that someone must have thrown a rock or brick at his car and he did not want to stop three or four miles from home on a dark highway. It reminded him of a previous experience he had had in 1958 when a rock was dropped from an overpass onto his car as he was driving. Dr. McNaught felt that he should go home and report the occurrence to the police. He kept driving and watching the fracture move across the windshield. He was beginning to think he should stop when he saw a patrol car's red lights in his rear view mirror. Defendant then stopped his car and remained inside until instructed by Deputy Sheriff Jeff Ritchie to open the car door.

Deputy Ritchie testified that he first observed defendant's vehicle on 46th Street with its bright lights on, traveling at a high rate of speed and emitting sparks from under its right side. The officer flashed his bright lights on and off but received no response from the oncoming vehicle. Ritchie continued to notice the sparks as the vehicle passed. Ritchie then turned his car around and pursued the vehicle. He caught up with it approximately one mile down the road. The vehicle stopped in the middle of the roadway without pulling over to the shoulder. Defendant asked the officer what the problem was. The officer looked at the defendant's vehicle and noticed a smashed windshield covered with blood and hair. Officer Ritchie showed the defendant a bicycle which had fallen from underneath defendant's car as it hit a bump just before it came to a stop. The defendant said that someone had thrown a brick at his vehicle approximately one mile back.

Shortly thereafter, Trooper Thomas Wilson of the Kansas Highway Patrol arrived at the scene to assist Ritchie. Trooper Wilson noticed that defendant's eyes were watery and bloodshot, and that he was swaying when walking. The trooper noticed a mild odor of alcohol on defendant's breath. Trooper Thomas Wilson gave the defendant a horizontal gaze nystagmus test. Trooper Wilson then placed defendant under arrest for driving

under the influence of alcohol. Wilson thereafter turned defendant over to Sergeant William Hudson of the Shawnee County Sheriff's Department who took defendant to the courthouse and performed a breath alcohol intoxilyzer test which tested .136 percent blood alcohol.

The defendant was charged by Sgt. Hudson with driving under the influence of alcohol, failure to render aid at an injury accident, failure to report an injury accident, and leaving the scene of an injury accident. Later, after Kathy Bahr died, defendant was charged in the complaint with involuntary manslaughter (K.S.A. 1984 Supp. 21-3404) in addition to the charges already made by Sgt. Hudson. Further facts will be provided in the discussion of points raised on the appeal.

The case was tried to a jury in Shawnee County District Court. The evidence presented by the parties was highly conflicting. Defendant testified, in substance, that from 4:15 p.m. to 6:30 p.m. he and a friend had consumed three highballs, each consisting of one and one-half ounces of bourbon, ice, and Tab. Dr. McNaught and the friend then sat down to dinner at 6:30 p.m, during which Dr. McNaught drank a four ounce glass of red wine. Dr. McNaught's dinner companion left the house at 7:00 p.m. He testified that Dr. McNaught had no trouble walking or talking and displayed no effect of the alcohol at that time. Dr. McNaught testified that he had nothing else to drink after his friend left, and he then sat down to read a book. At around 8:30 p.m. he became hungry for something sweet. He drove to Sutton's North Plaza where he purchased two bags of candy and returned to his car. He experienced no difficulty in walking, talking, paying for the candy or driving his car. Dr. McNaught then proceeded to drive his vehicle proceeding home on 46th Street and the collision occurred.

There was evidence presented by defendant that the drivers of two other vehicles traveling on 46th Street had barely avoided striking the bicycle and had to suddenly turn aside in order to avoid a collision. The defendant also presented expert testimony that Kathy Bahr possibly had been struck by another automobile as she lay on the pavement after the collision with Dr. McNaught's vehicle.

The case was tried in a highly professional manner by able counsel for both sides and was submitted to the jury. The jury

acquitted Dr. McNaught of the felony charge of involuntary manslaughter, leaving the scene of an injury accident, failure to render aid, and failure to report an injury accident. It found defendant guilty of vehicular homicide and driving under the influence of alcohol, both misdemeanors. Defendant filed a motion for a new trial which was denied. The court then sentenced defendant, and he filed a timely appeal. Defendant in his brief on appeal raises 13 separate points involving claimed errors at the pretrial and trial stages and in the imposition of sentence.

The defendant's first two issues on appeal involve the presence of cameras and audio recording devices in the courtroom at the preliminary hearing and again at the trial. Defendant maintains that the court's allowance of photographic, video, and audio reproduction of the preliminary hearing and of the trial was inherently coercive to the jury and prevented a fair and impartial trial. The record shows that, prior to the preliminary hearing and in response to a telephone inquiry from the court, defense counsel wrote a letter to the judge objecting to cameras and audio reproduction of the preliminary hearing, which had been requested by the news media pursuant to a Supreme Court rule. Defendant filed a motion to establish his objections of record with a copy of the letter attached. Judge Allen wrote a letter to defense counsel explaining his reasons for allowing photographs and audio reproduction at the preliminary hearing. Judge Allen stated in his letter as follows:

"The basis of your objection is the fact that potential jurors may see broadcasts and therefore photographing and audio reproduction at the preliminary hearing stage would be highly inflammatory and prejudicial to the defendant, particularly since this case has been the subject of numerous newspaper articles and television and radio station stories already.

"Criminal cases are commonly the subject of pretrial publicity and they always have been so the basis of your objection addresses a matter which is familiar to our legal system and satisfactory methods have been devised to meet the problem without denying the news media of their privilege to report the news through the opportunity to voir dire jurors and, whenever necessary, change venue.

"In this particular case, it is my opinion that the traditional methods devised by the law for handling this problem are appropriate to this case and that it would not be a proper exercise of the court's discretion to deny the news media its privilege of photographing and audio reproduction of the preliminary hearing in this case."

Simply stated, defendant maintains that the photographing

and audio reproduction of the preliminary hearing was inherently corruptive to potential jurors and thus had the effect of preventing a fair and impartial trial later. A determination of this issue requires us to consider the background and development of news media coverage of court proceedings in Kansas. In 1937, the American Bar Association adopted Canon 35 of the Canons of Judicial Ethics prohibiting broadcast and photographic coverage of court proceedings. For a discussion of the historical background of Canon 35 see *Chandler v. Florida*, 449 U.S. 560, 66 L.Ed.2d 740, 101 S.Ct. 802 (1981). In 1952, Canon 35 was amended to prohibit television coverage of judicial proceedings. The State of Colorado was the first state to amend Canon 35 to permit broadcast or photographic coverage of the judicial proceedings in the state courts. The prohibition in Canon 35 continued in effect when the American Bar Association replaced the Canons of Judicial Ethics in 1972 with the Code of Judicial Conduct. The Kansas Supreme Court, in Rule No. 601 of the Rules Relating to Judicial Conduct, adopted Canon 3A(7) (225 Kan. cxxi), which prohibited televising and taking pictures of the courtroom and the area adjacent thereto, subject to stated exceptions not involved here.

In 1978, the American Bar Association's Committee on Fair Trial—Free Press proposed that television, radio, and photographic coverage of court proceedings be permitted whenever the trial judge determined that such coverage would be unobtrusive and would not distract the attention of trial participants. However, the proposal was not adopted by the ABA House of Delegates. Since that time, the federal courts have continued to adhere to the prohibitions against the taking of photographs in the courtroom during the progress of judicial proceedings or radio broadcasting of judicial proceedings from the courtroom.

In 1981, the Supreme Court of Kansas amended the Code of Judicial Conduct under Supreme Court Rule 601, exempting the Supreme Court from the prohibition. Canon 3A(7)(d) (228 Kan. cxxxi). By order dated January 6, 1981, the court adopted a new Supreme Court Rule No. 1.07 (235 Kan. lvii), which permitted the use of audio tape recorders to record any portion of a hearing before the Supreme Court. Such recordings were to be closely supervised to prevent distracting participants in the hearing or impairing the dignity of the proceedings or to prevent in any way

the interference with the administration of justice. Thereafter, in April of 1981, the Supreme Court permitted the use of cameras by the news media to photograph proceedings before the Supreme Court during hearings conducted during the week of May 4, 1981, and later at proceedings held in June of 1981. On July 10, 1981, the Supreme Court entered an order providing for a one-year experiment for photographic and television news media coverage of Supreme Court proceedings commencing September 14, 1981, under restrictive procedures which limited the number of TV cameras and required a media pooling arrangement. By order entered June 16, 1982, the use of cameras by the news media was expanded to include the use of cameras in proceedings before the Court of Appeals. Television coverage in the Kansas appellate courts was made permanent. Since that time, the news media has been permitted television coverage in the appellate courts upon request.

In 1983, the photographing and recording of proceedings before the district courts of Kansas on an experimental basis was considered. On December 15, 1983, the court authorized the news media and educational television stations to photograph and tape record public proceedings before the district courts of the 3rd, 5th, 10th, and 18th judicial districts during the calendar year of 1984. This was to be subject to certain procedures and conditions specifically adopted by the court in Supreme Court order 83 SC 14 (236 Kan. vii [Adv. Sheet No. 3]). The privilege granted by the Supreme Court order was to be exercised by the news media for the purpose of news dissemination and education only. Condition No. 2 of the order vested in the trial judge the power to limit and control audio and television coverage in the following language:

"2. The privilege granted by Supreme Court Order 83 SC 14 does not limit or restrict the power, authority or responsibility of the trial judge to control the proceedings before the judge. The authority of the trial judge to exclude the news media or the public at a proceeding or during the testimony of a witness extends to any person engaging in the privilege authorized by Supreme Court Order 83 SC 14."

The order also contained other specific restrictions on the use of cameras and audio reproduction in trial court proceedings, including the requirement that the administrative judge of each district designate a media coordinator to work with the judges and the media in implementing the privilege conferred by the

rule. All of these restrictions were designed to prevent disruption or interference with the judicial proceedings involved. On December 27, 1984, the Kansas Supreme Court, in response to certain objections, modified the conditions and proceedings in certain aspects and authorized the district courts in 13 of the 31 judicial districts to allow television cameras at proceedings during the calendar year 1985. Again the trial judge was given full power, authority, and responsibility to control media coverage at the trial, so that a fair trial would be insured. On December 20, 1985, the Supreme Court ordered that the rule remain in full force and effect until March 1, 1986.

Generally speaking, the propriety of granting or denying permission to the media to broadcast, record, or photograph court proceedings involves weighing the constitutional guaranties of freedom of the press and the right to a public trial on the one hand and, on the other hand, the due process rights of the defendant and the power of the courts to control their proceedings in order to permit the fair and impartial administration of justice. The courts also generally agree that the constitutional right to a public trial does not entitle the press to broadcast, record, or photograph court proceedings, because the right to a public trial is primarily for the benefit of the defendant, and because the requirement of a public trial is satisfied when members of the press and public are permitted to attend a trial and to report what transpires.

The effect of television coverage of judicial proceedings on the due process right of criminal defendants was the subject of the decision in *Chandler v. Florida*, 449 U.S. 560. In *Chandler*, the United States Supreme Court held that the due process rights of an accused are not inherently denied by television trial coverage, and that no per se constitutional rule prohibits the states from permitting broadcast or photographic coverage of criminal trial proceedings. The court pointed out, however, that depending upon the circumstances under which such coverage takes place, a due process violation might result. The courts have cautioned that there may be circumstances under which such coverage should be prohibited, particularly when it would have a substantial adverse effect on a trial participant. Whether broadcast or photographic coverage of court proceedings, particularly criminal trials, violates the constitutional rights of trial

participants, particularly criminal defendants, depends upon the circumstances under which such coverage takes place. Suggested relevant circumstances are the location of the broadcast or photographic equipment in the courtroom; the degree of distraction or disruption, if any, caused by their presence; and the effect of the presence and use of such equipment on the defendant's ability to present his case. There are many cases discussed in depth on this subject in an excellent annotation, Media Coverage of Court Proceedings, contained in 14 A.L.R. 4th 121. The leading case is *Chandler v. Florida,* mentioned heretofore.

The problem of media audio and television coverage of a preliminary hearing, as distinguished from a trial proceeding, is somewhat different, because a preliminary hearing is a pretrial proceeding for the determination of probable cause, and trial jurors are not present so as to be personally affected by the media coverage of the preliminary hearing. It is well recognized, however, that adverse publicity at a preliminary hearing may endanger the ability of a defendant to receive a fair trial in situations where prospective trial jurors read or hear the adverse publicity and are affected in their judgment should they later sit as jurors.

In *Kansas City Star Co. v. Fossey,* 230 Kan. 240, 630 P.2d 1176 (1981), this court discussed in depth the question as to when a district court may close a preliminary hearing, a bail hearing, or any other pretrial hearing, in order to avoid the prejudicial effect of media publicity on the fairness of a future trial. In that case, it was held that a trial court may close a preliminary hearing, jail hearing, or any other pretrial hearing, including a motion to suppress, and may close a record only if:

(1) The dissemination of information from the pretrial proceeding and its record would create a clear and present danger to the fairness of the trial, and

(2) the prejudicial effect of such information on trial fairness cannot be avoided by any reasonable alternative means.

The usual remedy for adverse pretrial publicity is a change of venue and this should be so whether the adverse publicity is in the form of a printed newspaper or television exposure. In *State v. Richard,* 235 Kan. 355, 364, 681 P.2d 612 (1984), it was noted that this court has repeatedly held that one moving for a change of venue has the burden of establishing prejudice, and specific

facts and circumstances must be established which indicate that it will be practically impossible to obtain an impartial jury in the original county to try the case. In *State v. Crump*, 232 Kan. 265, Syl. ¶ 6, 654 P.2d 922 (1982), the following rules were stated concerning a change of venue in criminal cases:

"A change in venue in a criminal case lies within the sound discretion of the trial court. The burden of proof is cast upon defendant to show prejudice in the community which will prevent him from obtaining a fair and impartial trial. Media publicity alone has never established prejudice per se. Defendant must show prejudice has reached the community to the degree it is impossible to get an impartial jury."

To the same effect is *State v. Taylor*, 234 Kan. 401, 404, 673 P.2d 1140 (1983), which holds that when a change of venue is requested, the defendant must show that prejudice exists in the community, not by speculation, but as a demonstrable reality.

In applying these rules to the factual circumstances shown in the record in the case now before us, it is clear that defendant has not shown that his rights were adversely affected by media coverage in the courthouse during the preliminary hearing, nor has he presented evidence that any individual juror's ability to judge the defendant fairly was influenced by media coverage prior to trial. The voir dire of the jurors was not transcribed for the record nor were any affidavits or testimony obtained from any juror as to the effect of pretrial publicity. We hold that defendant's first point on appeal is without merit.

As to the defendant's second point on the appeal, that the trial court erred in allowing photographic, audio, and video reproduction of the trial proceedings, we have likewise concluded that the defendant has failed to show prejudice resulting from media coverage at the trial. The record shows that the trial court on several occasions admonished the jurors to refrain from hearing or reading media reports of the trial. In *Chandler v. Florida*, 449 U.S. 560, the United States Supreme Court stated that to demonstrate prejudice in a specific case, a defendant must show something more than juror awareness that the trial is of sufficient interest to attract the attention of the media. In this case, the defendant has failed to show in the record that the media coverage in the courthouse prevented defendant from presenting his defense or in any way affected the ability of the jury to judge defendant fairly. We hold this point to be without merit.

The third issue raised on the appeal is that the trial court erred

in overruling defendant's motion in limine to prohibit the wearing of Mothers Against Drunk Driving (MADD) and Students Against Drunk Driving (SADD) buttons by spectators at the trial on the basis that display of the buttons was inherently coercive to the jurors and prejudicial to the defendant's right to a fair trial. The trial court denied the defendant's motion, stating that defendant had not furnished the court with any authority in support of his motion. Following defendant's conviction, he also alleged as one of the grounds in his motion for a new trial that the trial court erred in overruling his motion in limine to prohibit the display of MADD and SADD buttons by spectators at the trial.

One of the fundamental rights of a criminal defendant is his right to a public trial. Trial court proceedings are generally required to be open and public, and a public trial is one which is public in the ordinary, common-sense meaning of the term. A public trial is not solely a private right of the parties, but one involving additional interests, including those of the public. The concept of a public trial implies that doors of the courtroom be kept open and that the public, or such portion thereof as may be conveniently accommodated, be admitted, subject to the right of the court to exclude objectionable characters. As long as the doors of a courtroom are open so that a reasonable proportion of the public is allowed to attend, the right to a public trial is satisfied. See 75 Am. Jur. 2d, Trial § 33, p. 146, and cases cited therein.

In the administration of justice, the trial judge is charged with the preservation of order in his court and with the duty to see that justice is not obstructed by any person or persons whatsoever. A large measure of discretion resides in the trial court in this respect, and its exercise will not be disturbed on appeal unless it appears that prejudice resulted from the denial of a legal right. One of the ideals of criminal jurisprudence is that a defendant is entitled to a trial in a calm judicial atmosphere, to mininize any possibility of a decision being rendered on speculation or emotion rather than on the facts and logical reasoning. On occasions, however, the decorum of the courtroom has been distrubed by demonstrations by spectators. On such occasions, in determining whether or not a defendant was denied a fair trial, the decision of whether the jury was or possibly could have been influenced is one which is necessarily left to the sound discretion of the trial

court, the exercise of which will not be disturbed unless it appears that prejudice resulted from the disturbance. In this regard, see the excellent annotation on "Disruptive Conduct of Spectators in Presence of Jury During Criminal Trial as Basis for Reversal, New Trial, or Mistrial" as contained in 29 A.L.R. 4th 659.

These same principles of law are recognized in the Kansas cases. In *State v. Franklin*, 167 Kan. 706, 208 P.2d 195 (1949), the defendant was charged with murder in the second degree and, while the defendant was testifying in his own behalf, the mother of the victim of the homicide arose in the courtroom and screamed, "He killed my son," repeating it four times. The Supreme Court on appeal stated that the real concern of the matter was whether the outburst had the effect of denying the defendant the fair trial to which he was entitled. The court stated that it realized that there are instances in which, depending upon the particular facts and circumstances, outbursts of emotion, weeping, fainting, applause, or other demonstrations could be considered so highly prejudicial to the rights of a defendant as to require the granting of a new trial, but the court did not feel that the case before it would fall within that class. The court stated that it was within the sound discretion of the trial judge to determine the effect of such outbursts or demonstrations and, in the absence of a clear showing that the jury was improperly affected thereby to the prejudice of the defendant, the ruling of the lower court in denying a new trial would not be disturbed. We also note *State v. McMahan*, 131 Kan. 257, 291 Pac. 745 (1930), where it was held that unless it is shown by the defendant that the demonstration was of such a character as to have influenced the jury or affected its verdict, it cannot be regarded as a ground for reversal of a conviction.

In the case now before us, the defendant contends that the display of MADD and SADD buttons by spectators at the trial was inherently coercive and prejudicial to the defendant. The question of prejudice resulting from the display of MADD and SADD buttons by spectators is one of first impression in Kansas. Cases in other jurisdictions have addressed the same or similar issues.

In *State v. Johnson*, 479 A.2d 1284 (Me. 1984), the defendant was convicted of manslaughter arising out of an automobile

collision. It was held that a mere showing of awareness on the part of the jury of a well-known organization such as MADD was insufficient to demonstrate actual prejudice so as to require reversal as a matter of constitutional due process.

In *Smith v. State,* 460 So. 2d 343 (Ala. Crim. App. 1984), the defendant Smith was convicted of murder resulting from a head-on automobile collision. The evidence showed that the defendant was given a blood alcohol test and the results greatly exceeded the statutory level of intoxication. On appeal, the defendant contended that the presence of Mrs. Dee Fine in the courtroom influenced the jury's decision. Mrs. Fine was well known as being instrumental in organizing MADD in Alabama. The appellate court held that no prejudice had been shown and affirmed the conviction.

In *State v. McMurray,* 40 Wash. App. 872, 700 P.2d 1203 (1985), defendant appealed his conviction of negligent homicide. The defendant had pleaded guilty to DUI arising out of the same accident. On appeal, defendant contended that his trial was unfair, because MADD members attended the trial. The opinion does not specifically state whether the MADD members displayed buttons to indicate their affiliation with MADD. The Washington Court of Appeals found no prejudice had been shown arising from the MADD members' attendance at the trial which would justify reversing the conviction.

In *State v. Franklin,* _____ W.Va. _____, 327 S.E.2d 449 (1985), the Supreme Court of Appeals of West Virginia held that the obvious presence of members of organizations dedicated to stiffer penalities for drunk drivers, who were wearing badges, did irreparable damage to defendant's right to a fair trial and that the defendant's conviction should be reversed. In that case, on voir dire at the outset of the trial, a woman appeared for jury duty wearing a large bright yellow MADD lapel button. Apparently the local sheriff had handed her the button and told her where to sit. Although the prospective juror was immediately excused, the sheriff and other members of MADD remained highly visible throughout the trial. The defense counsel repeatedly requested a mistrial or alternatively asked the court to order removal of MADD buttons or the spectators wearing them from the courtroom. The trial court took no action, although from 10 to 30 MADD demonstrators prominently displayed MADD buttons

and sat directly in front of the jury throughout trial. The defendant contended that this demonstration by the MADD members deprived him of a fair and impartial trial. The trial court conducted an extensive voir dire on the subject of MADD and dismissed two potential jurors as a result of the voir dire but refused to take any other action against the MADD presence.

The appellate court noted the right to public access to a criminal trial should be coordinated with the constitutional right of a defendant to a fair trial. The appellate court concluded that, under the factual circumstances shown in that case, the spectators were clearly distinguishable from other visitors in the courtroom and, led by the sheriff, they constituted a formidable, albeit passive, influence on the jury. The appellate court stated that it could not say that the presence of the spectators wearing MADD buttons, combined with the presence and activities of the uniformed sheriff leading them, did not do irreparable damage to the defendant's right to a fair trial by an impartial jury.

The record in the case now before us does not show the factual circumstances present on this issue. The record is absolutely silent regarding the number of MADD and SADD members attending the trial or how many of them wore buttons. During oral arguments in this case, defense counsel contended that there were always 20 to 30 members of MADD in the courtroom. The prosecutor stated that there were only three to four such persons present wearing buttons. Defense counsel contended that one juror voiced some concern about the incident to Judge Vickers after trial. The prosecution denied that allegation. The record does not contain an affidavit or the testimony of any person that the jurors showed any concern about the matter.

We have carefully considered this issue and concluded that the defendant has failed to show that he was prejudiced in any way by the wearing of MADD and SADD buttons by spectators in the courtroom. A reading of the record and a consideration of the verdicts of the jury in this case show that the members of the jury carefully considered the evidence and were not prejudiced against the defendant. As noted heretofore in the opinion, the jury acquitted the defendant of involuntary manslaughter, the only felony charge, and also acquitted the defendant of leaving the scene of an injury accident, failure to render aid, and failure to report an injury accident. The jury found the defendant guilty

of vehicular homicide and driving under the influence of alcohol, both misdemeanors. The trial judge was present at all times throughout the trial and had a full opportunity to observe the conduct of the spectators and consider any effect they might have on the jury. We cannot say as a matter of law that the trial court abused its discretion in refusing to require the spectators to remove their buttons or in denying the defendant's motion for a new trial. Under all of the circumstances, we have concluded that the defendant has failed to show that he was prejudiced in any way by the conduct of the spectators, and we hold that he is not entitled to a reversal of his conviction based upon this issue.

The fourth issue raised on appeal is that the trial court erred in refusing to admit evidence offered by the defense that the defendant had taken and passed a polygraph test. The rule in Kansas is that, in the absence of a stipulation between parties, the results of a polygraph examination are not admissible into evidence. See *State v. Mason,* 238 Kan. 129, 708 P.2d 963 (1985), citing many prior Kansas decisions. It has been said that one of the primary reasons for disallowing polygraph evidence is the weight commonly placed upon the evidence by the jury, which results in the jury function being usurped. *State v. Martin,* 237 Kan. 285, 293, 699 P.2d 486 (1985). In the present case there was no stipulation, and the trial court did not err in refusing to admit the results of the polygraph examination.

The fifth point raised on the appeal is that the trial court erred in admitting the results of the intoxilyzer test into evidence. The defendant first contends that the machine was not shown to be sufficiently accurate or reliable to allow the results of the breath test to be considered by the jury. The Kansas Court of Appeals has addressed the foundation necessary to admit the results of such a test, stating that testimony which establishes a breathalyzer test machine has been approved and certified by the State as of the date of the test is sufficient foundation testimony to establish the validity of the test results from the machine. *City of Shawnee v. Gruss,* 2 Kan. App. 2d 131, 576 P.2d 239, *rev. denied* 225 Kan. 843 (1978); *State v. Bristor,* 9 Kan. App. 2d 404, 682 P.2d 122, *rev'd on other grounds,* 236 Kan. 313, 691 P.2d 1 (1984). In this case the intoxilyzer test was given to defendant on July 29, 1984. The State presented testimony from the supervisor of the breath/alcohol program of the Kansas Department of

Health that the particular intoxilyzer machine was tested on July 24, 1984, and again on July 31, 1984, and was functioning properly. Furthermore, he testified that at the time the test was given the particular intoxilyzer met all of the requirements required by law. This evidence was sufficient to show the reliability of the breath test conducted on the defendant and to provide a foundation for its admission into evidence.

The defendant next argues that the intoxilyzer test was not administered at the direction of the arresting officer pursuant to K.S.A. 8-1001, which states that such test shall be administered at the direction of the arresting officer. Simply stated, Trooper Wilson arrested the defendant but he did not administer the intoxilyzer test which was administered later by Sgt. Hudson. Because of an agreement between the Highway Patrol and the Shawnee County sheriff's office covering territorial jurisdiction, the sheriff's department had supervisory jurisdiction over the highway where the accident occurred in this case. It is clear that State Highway Trooper Wilson, after placing the defendant under arrest, turned the defendant over to Sgt. Hudson at the scene of the accident. Hudson read defendant his *Miranda* rights, booked the defendant into jail, conducted the test, and also filed the notice to appear which made him the arresting officer. We have no hesitancy in holding that the statute was satisfied, because the intoxilyzer test was administered by one of the arresting officers.

The defendant next contends that the defendant was not advised of his right to have an independent test of his breath conducted by a person of his own choosing nor was he afforded such opportunity to have such a test conducted at the time of his arrest. Although K.S.A. 8-1004 allows such an independent test, there is no requirement that the arresting officer advise the person arrested that he has a right to an independent test. The defendant also argues that the results of the test should not have been admitted, because the sample of defendant's breath was not retained by the State for testing at a later time by an expert of defendant's choosing. In *State v. Young*, 228 Kan. 355, 363, 614 P.2d 441 (1980), this court held that an arresting officer is not obligated to advise a person of his statutory right to an independent chemical test by a person of his choosing and that the failure of the arresting officer to automatically furnish the defendant

with a sample of his breath is not a denial of due process. See also *Standish v. Department of Revenue,* 235 Kan. 900, 683 P.2d 1276 (1984), where the court discusses the warnings required, in addition to the *Miranda* warnings, which an officer making a DUI arrest should make. For the above reasons, we hold that the trial court did not err in admitting the results of the intoxilyzer test into evidence.

The defendant next contends that the trial court erred in admitting the results of tests conducted by officers to show the visibility of the victim's bicycle reflectors. Defendant argues that these tests were not disclosed pursuant to a discovery order and that the tests were not conducted under conditions similar to those existing at the time of the accident. The State contended that the tests were conducted solely for the purpose of determining whether Kathy Bahr's bicycle reflectors were visible from a distance of 100 to 600 feet as required by K.S.A. 8-1592. Such evidence was not contemplated by the prosecution nor were the tests conducted until after defendant's voir dire examination stressed the lack of visibility of the victim's bicycle. We find no error in the admission of this evidence. The test results were relevant on the issue whether the bicycle reflectors satisfied the requirement of the statute that they be visible from 100 to 600 feet to an oncoming vehicle with low beam lights. The jury was made well aware that the test was conducted on level ground using stationary vehicles while the accident occurred on a hill while both the bicycle and defendant's car were moving. We hold that the trial court did not commit error in admitting the evidence.

The seventh issue on the appeal is whether the trial court erred in allowing the testimony of Steve Hale and Eileen Burnau, whose names were not endorsed on the information. Late endorsement of witnesses is covered by K.S.A. 1984 Supp. 22-3201(6). In *State v. Costa,* 228 Kan. 308, 315, 613 P.2d 1359 (1980), it was held that the endorsement of additional witnesses on an information is a matter of judicial discretion and will not be the basis for reversal absent proof of an abuse of discretion. The test is whether or not the rights of the defendant were unfairly prejudiced by the late endorsement. The purpose of the endorsement requirement is to prevent surprise to the defendant and to give him an opportunity to interview and examine the

witnesses for the prosecution in advance of trial. See also *State v. Royal*, 234 Kan. 218, 670 P.2d 1337 (1983). The record shows that the name of Steve Hale was on a list of Soldier Township personnel furnished to the defense prior to the preliminary hearing. The defendant subpoened Hale for the preliminary, although Hale did not testify. The trial court permitted the prosecution to call Steve Hale as a witness but provided the defense an opportunity to interview him before he testified. We hold that, under the circumstances, the defendant was not prejudiced. Eileen Burnau testified at the preliminary hearing where she was cross-examined by the defense. She did not testify any differently at the trial. Under the circumstances, we hold that the trial court did not abuse its discretion in permitting her to testify at the trial.

The eighth and ninth points raised on the appeal concern the trial court's refusal to give certain instructions requested by defendant and also certain instructions submitted to the jury. We have considered the arguments of counsel and find no error. The propriety of instructions given to the jury is to be gauged by consideration of the instructions as a whole; each instruction must be considered in conjunction with all the others. *State v. Price*, 233 Kan. 706, 664 P.2d 869 (1983). Considered as a whole, the instructions as given adequately instructed the jury on all phases of the case.

The tenth point raised is that the trial court erred in its answers to questions asked by the jurors during deliberations. We cannot say that the trial court erred in any way in its responses to the two questions presented to the court by the jury.

The eleventh issue on appeal is whether the trial court erred in overruling defendant's motion for dismissal or, in the alternative, defendant's motion for acquittal. Simply stated, the defendant challenges the sufficiency of the evidence to sustain the two guilty verdicts in this case. A trial judge, passing on a defendant's motion for judgment of acquittal or for dismissal because of insufficiency of the evidence, must determine whether upon the evidence, giving full play to the right of the jury to determine credibility, weigh the evidence, and draw justifiable inferences of fact therefrom, a reasonable mind or a rational trier of fact might fairly conclude guilt beyond a reasonable doubt. *State v. Falke*, 237 Kan. 668, 703 P.2d 1362 (1985). We have no hesitancy

in holding that the record reflects sufficient evidence to show that the defendant was driving under the influence of alcohol and in a manner which deviated from the standard of care of a reasonable person. The jury was undoubtedly impressed by the fact that, following the impact of the deceased's body with defendant's windshield, he failed to stop and drove a mile down the highway, even though the deceased's bicycle was being dragged under defendant's car. The evidence presented at the trial was sufficient to satisfy the legal requirements and to sustain the two guilty verdicts.

The twelfth point on appeal is that the trial court erred in denying defendant's motion for a new trial. The basis of the motion includes all of the points previously discussed and rejected in this opinion. We find no error.

The last issue raised in the brief of defendant is that the trial court imposed an illegal sentence. Prior to the sentence being imposed in this case, the trial court conducted an evidentiary hearing at which both the State and the defendant presented evidence. The trial court was also furnished a presentence report, a copy of which is not provided in the record. Counsel were then permitted to make their arguments as to what sentence would be appropriate. At the close of the hearing, the court imposed the following sentence: Defendant was sentenced to the custody of the Shawnee County jail for a period of one year for the offense of vehicular homicide (K.S.A. 21-3405) and for a period of six months for the offense of driving under the influence as defined by K.S.A. 1984 Supp. 8-1567. These terms are the maximum imprisonment authorized for these offenses. The court ordered the sentences to run consecutively. In addition, the defendant was ordered to pay a fine of $2,500 for vehicular homicide and a fine of $500 for driving under the influence. The fines imposed are the maximum fines provided as a penalty for each offense. The trial court thus imposed the maximum imprisonment and fines allowed by law for the offenses of which defendant had been convicted.

The trial court, however, did not stop at that point. The trial court ordered that, upon his release from jail, the defendant enroll and successfully complete an alcohol/drug abuse program at Ridgeview Institute in Georgia. Defendant was further ordered to pay the parents of Kathleen Bahr restitution in the

amount of $13,318.08, which included the cost of the funeral, tombstone, incidental expenses, and a $5,000 fee for the special prosecutor. The trial court further ordered that the defendant's driver's license be revoked pursuant to statute and be surrendered to the court when the conviction becomes final. The trial court further ordered that completion of the program at Ridgeview Institute and complete payment of restitution were conditions to be complied with before defendant's driver's license could be returned. Finally, defendant was assessed the statutorily required alcohol and safety program fee, probation services fee, and the costs of the action. The defendant was released on bond pending his appeal.

The defendant first challenges his sentence on the basis that the court ignored the statutory mandates of K.S.A. 21-4601 and K.S.A. 21-4606. K.S.A. 21-4601 provides, in substance, that, in imposing sentence, a convicted defendant should be dealt with in accordance with his individual characteristics, circumstances, needs, and potentialities; that dangerous offenders be correctively treated in custody for long terms as needed; and that other offenders be dealt with by probation, suspended sentence, or fine whenever such disposition appears practicable and is not detrimental to the needs of public safety and the needs of the offender. K.S.A. 21-4606 provides that the court in imposing sentence shall fix the lowest possible term of imprisonment which, in the opinion of the court, is consistent with the needs of the defendant and the seriousness of the defendant's crime. That statute then lists a number of factors to be considered by the court in fixing the term of imprisonment.

In substance, defense counsel argues that the trial court completely disregarded the requirements and the factors set forth in the two statutes. He points out that Dr. McNaught had no prior history of alcohol abuse or of any misconduct and that the jury acquitted him on the only charge involving intentional or wanton misconduct. Defendant argues that the sentence was so excessive as to amount to an abuse of judicial discretion.

We have considered the entire record of the trial, the evidence presented at the time of sentencing, and the remarks of the court when it imposed sentence. We have concluded that the trial court did not abuse its discretion in the imposition of the maximum jail sentence and the maximum fine for each of the charges

for which the defendant was convicted. Generally, when a sentence is within the statutory limits set forth by the legislature, it will not be disturbed on appeal absent special circumstances showing an abuse of discretion or that the sentence is the result of prejudice, oppression, or corrupt motive. *State v. Coberly*, 233 Kan. 100, 661 P.2d 383 (1983). Prior to the imposition of sentence, the trial court obtained all possible information about the defendant's past history, the nature of the offenses, and the defendant's personal problems. There was evidence presented that the defendant has an alcohol problem which he has refused to recognize. The trial court may well have concluded that the imposition of jail time along with the fines were necessary to get his attention so that defendant would do something about his problem because, until defendant recognized his problem, he was a potential danger to the traveling public. We must also recognize that by imposing sentence in the Shawnee County jail, the trial court in its discretion could place the defendant upon parole when a showing was made later that a parole was indicated in the case. We hold that the trial court did not abuse its discretion in imposing the maximum jail sentences and fines and in making the jail sentences to run consecutively. Revocation of defendant's driver's license was authorized by K.S.A. 1984 Supp. 8-1567(j).

At that point, the sentence was legal under the statute. However, the court, having imposed the maximum penalty provided for each offense, then, without placing defendant on probation, ordered defendant to pay restitution to the Bahr family and to enroll in and successfully complete an alcohol treatment program in the State of Georgia. Also after revoking defendant's driver's license as required by statute, the court required that defendant's driver's license be restored only after full restitution and after the alcohol treatment had been completed and paid for. The court also ordered defendant to pay the alcohol and safety program fee of $85 and the probation services fee of $25, even though the defendant had not been placed on probation at the time of sentence.

The fixing and prescribing of penalties for criminal offenses is a legislative function, and a sentence must be imposed within the statutory authority. *State v. Freeman*, 223 Kan. 362, 369, 574 P.2d 950 (1978). K.S.A. 1984 Supp. 21-4603(2) provides:

"(2) Whenever any person has been found guilty of a crime, the court may adjudge any of the following:

"(a) Commit the defendant to the custody of the secretary of corrections or, if confinement is for a term less than one year, to jail for the term provided by law;

"(b) impose the fine applicable to the offense;

"(c) release the defendant on probation subject to such conditions as the court may deem appropriate, including orders requiring full or partial restitution;

"(d) suspend the imposition of the sentence subject to such conditions as the court may deem appropriate, including orders requiring full or partial restitution; or

"(e) impose any appropriate combination of (a), (b), (c) and (d).

"In imposing a fine the court may authorize the payment thereof in installments. In releasing a defendant on probation the court shall direct that the defendant be under the supervision of a court services officer.

"The court in committing a defendant to the custody of the secretary of corrections shall fix a maximum term of confinement within the limits provided by law. In those cases where the law does not fix a maximum term of confinement for the crime for which the defendant was convicted, the court shall fix the maximum term of such confinement. In all cases where the defendant is committed to the custody of the secretary of corrections, the court shall fix the minimum term within the limits provided by law."

In *State v. Chilcote*, 7 Kan. App. 2d 685, 647 P.2d 1349, *rev. denied* 231 Kan. 801 (1982), the Kansas Court of Appeals addressed the same basic issue presented in this case and held that, under K.S.A. 21-4603(2), the trial court may not sentence a defendant to imprisonment in an institution and also require the defendant to pay restitution. In *Chilcote*, defendant argued that the trial court could not order restitution in conjunction with imprisonment and restitution may not be ordered unless the sentence is suspended pursuant to K.S.A. 21-4603(2)(d) or unless probation is granted pursuant to K.S.A. 21-4603(2)(c). The Court stated:

"In the instant case, the judge combined K.S.A. 21-4603(2)(a) (imprisonment) with an order of restitution; restitution may only be ordered pursuant to subsection (c) of that statute, which provides for release on probation subject to restitution, or subsection (d) thereof, providing for the suspension of sentence subject to restitution. Thus, the trial court has combined all of subsection (a) with only the restitution portion of either subsection (c) or (d). Said statute, at subsection (e), gives the trial court authority to 'impose any *appropriate* combination of (a), (b), (c) and (d).' (Emphasis added.) Appellant points out that subsection (e) does not say 'or any parts thereof,' and contends that the trial court therefore lacks authority to combine only *parts* of various subsections. We conclude that appellant is correct in this contention. In applying 21-4603(2)(e), a trial court may only impose sentences which are combinations of entire subsections. The use of the word 'appropriate' implies that the combination of penalties

under the statute should be harmonious. Thus the trial court may not impose imprisonment, which mandates incarceration, with either probation or suspension of sentence, because to do so would be to decree mutually exclusive penalties. As we construe the statute, restitution may only be ordered in conjunction with probation or suspended sentence. It follows that incarceration coupled with restitution is not an 'appropriate combination' under subsection (e)." 7 Kan. App. 2d at 689-90.

The Court of Appeals remanded the case to the trial court with orders to vacate that part of the sentence requiring the defendant to make restitution.

The principles of law applied in *State v. Chilcote* are also applicable under the facts of this case. Here the maximum sentences of imprisonment and the maximum fines were imposed by the court. The court then, without placing the defendant on probation or suspending sentence, ordered restitution paid and, in addition, that defendant participate in a treatment program. The court also imposed other conditions which are usually imposed as conditions of probation. We hold that the trial court erred in ordering imprisonment, fines, restitution, and imposing the other conditions. Of course, should the trial court opt to resentence defendant within the time allowed for the revision of sentences, the court may cause the defendant to appear before it for resentencing. The trial court also has the authority to parole defendant from a portion of the sentence at some future date and impose appropriate conditions, including restitution. In view of our holding on this point, we do not consider it necessary to consider the other objections which defense counsel has raised in his brief pertaining to the conditions imposed in sentencing.

At the oral argument, counsel for defendant raised a point which had not been raised before the trial court and which had not been raised in his brief on appeal. That point was whether the employment of an associate prosecutor pursuant to K.S.A. 19-717 and selected by the victim's family, denied defendant due process of law. We decline to consider that issue, because it was neither timely raised nor presented to the trial court for its consideration.

The judgment of conviction is affirmed. That portion of the sentence imposing imprisonment and a fine on each count is affirmed. That portion of the sentence ordering restitution and imposing other conditions is vacated and set aside.