**Kristen Aleia SIMPSON, Appellant**

v.

**The STATE of Texas**

**NO. PD–0940–14**

Court of Criminal Appeals of Texas.

Filed: October 15, 2014

Peyton Z. Peebles III, for Appellant.

Petition for discretionary review refused.

COCHRAN, J., filed a statement concurring in the refusal of the petition in which JOHNSON and HERVEY, JJ., joined.

I agree with the Court's decision to refuse appellant's petition for discretionary review because I believe that the error in this case-the trial judge's display of a Mothers Against Drunk Drivers (MADD) plaque in the courtroom during appellant's DWI trial-was neither inherently prejudicial nor actually prejudicial. I write to squarely say what the court of appeals's majority assumed: This was error.

### I.

On April 29, 2011, William Pineda was driving a Mustang on Westheimer Road in Houston at around 7:30 at night, when he noticed a woman in a Nissan tailgating him even though traffic was light. He sped up to get away from her, but she sped up also. When another car braked in front of Mr. Pineda to turn left, he braked and was hit from behind by the Nissan-not once, but twice. Mr. Pineda pulled into a nearby shopping center parking lot and "called the cops, and the lady who hit me, she got [out of] her car and she told me, hey, don't worry; I'll pay for everything. Don't call the police." There was a bit of a language barrier, but Mr. Pineda, who was from El Salvador, understood "70%" of what she said. He was reluctant to settle the matter without police involvement because he had never been in an accident before, and he did not want to jeopardize his commercial license. Two police officers arrived at the scene shortly afterward.

When Officer Zhang approached appellant, he "noticed that she had bloodshot eyes and a moderate smell of alcohol and slurred speech." When he performed the HGN test on her, he observed all six intoxication clues. He arrested appellant and drove her to "Central Intox" where civilian evidence technician Thomas Wooten administered (and recorded video of) other field tests. Appellant could not physically complete the tests, but Mr. Wooten was "absolutely" certain that she was intoxicated. Appellant herself acknowledged that her drinking "apparently" affected her ability to drive.[1]

---

1. The interview was described as follows:

Q. So after you conducted the field sobriety test you asked her a series of questions, one of them was were you driving, and what was her answer?
A. Yes.
Q. Were you in an accident, and what was her answer?
* * *

A. She said she was involved in a two-car accident and that she rear ended someone else because she couldn't react fast enough.
Q. And you also asked her did she have anything to drink. Did she admit to drinking?
A. Yes, sir.
Q. And did you ask her did the alcohol affect your ability to drive?
A. Yes, sir. She said obviously it did.

Appellant was charged with DWI. During voir dire, appellant's counsel questioned the potential jurors about a plaque leaning against the back wall behind the trial judge's chair. Potential jurors confirmed that they could tell the plaque said "MADD" and realized it was from Mothers Against Drunk Driving. In front of the jury panel, counsel asked the trial judge to remove the plaque, but he refused. During the trial—but outside of the presence of the jury—counsel requested that Judge Harmon recuse himself because "for you to endorse it and having it sitting right behind you makes the court appear impartial [sic]."[2]

Judge Harmon orally denied the motion. On the written order he noted, "The defendant wanted the court to assess punishment. Obviously the defendant does *not* feel the court has a personal bias or she would never have made that election."

The recusal motion was then assigned to Judge Hughes for a hearing. At the conclusion of the hearing, Judge Hughes stated, "The motion to recuse is denied, but I would strongly hope that the Judge would do the right thing and take down the plaque." But Judge Harmon did not do the right thing, and the trial proceeded with the MADD plaque plainly visible to the jury.[3]

After sending out four notes during its deliberations,[4] the jury found appellant guilty. The trial judge sentenced her to one year of community supervision and a $500 fine.

Appellant argued on direct appeal that the trial judge erred by refusing to remove the MADD plaque. The majority skirted the issue of whether the judge erred, holding that any error was harmless. The dissenting justice concluded that appellant had not had a fair trial.[5] Appellant filed for discretionary review, asserting that the dissenting justice was correct.

## II.

"The presumption of innocence . . . is a basic component of a fair trial under our

---

Q. Okay. Now in the video, I mean, she said apparently it did?
A. Yes, sir, apparently it did.

2. Defense counsel obviously meant exactly the opposite-that the MADD plaque made Judge Harmon appear "partial" or "biased" instead of "impartial" or "unbiased."

3. Several photographs showing the prominent position of the MADD plaque are in the record.

4. The notes read: "Do we need to be unanimous?"; "May we please have the video from Central Intox?"; "Jury is deadlocked; Split is 3–3." and "May we please see the video again . . . ?"

5. *Simpson v. State,* No. 01–12–00380–CR, 2013 WL 6869923, at *25–26 (Tex.App.—Houston [1st Dist.] Dec. 31, 2013) (Sharp, J., dissenting) (not designated for publication) ("To display behind the trial bench a plaque awarded by one of the most well-established interest groups in the nation not only fails to keep the interest group at bay, but also invites others to take notice that, in the judge's capacity as a public official, his actions merited the group's commendation. When that interest group is [MADD]—a group dedicated to the proposition that the offense for which the accused citizen is being tried in that very courtroom is a very bad and potentially horrific thing—the sanctuary has been twice defiled: not only by the agenda of the interest group, but also by the hubris of the judge charged with the responsibility of assuring a fair and impartial DWI trial"; concluding that the display had a substantial influence on the jury's verdict). This is the dissent from the original memorandum opinion. On motion for rehearing, the majority opinion of December 31, 2013, was withdrawn and a substitute majority opinion was issued in its place. *Simpson v. State,* No. 01–12–00380–CR, 2014 WL 2767126 (Tex.App.—Houston [1st Dist.] June 17, 2014). The dissent remained the same.

system of criminal justice."[6] To implement it, courts must be alert to factors that may undermine the fairness of the fact-finding process, and "guard against dilution of the principle that guilt is to be established by probative evidence and beyond a reasonable doubt."[7] That said, a trial judge has broad discretion to control the business of the court and in how he preserves proper order and decorum.[8]

In *Estelle v. Williams*,[9] the Supreme Court found that making a defendant wear identifiable prison clothing at his jury trial denies him due process and equal protection because "of the possible impairment of the presumption [of innocence] so basic to the adversary system."[10] Such "inherently prejudicial" practices are permitted only when justified by an essential state interest that is specific to that trial, and no "essential state policy" is served by compelling a defendant to dress in this manner.[11] On the other hand, in *Holbrook v.*

*Flynn*,[12] the Supreme Court found that the presence of four uniformed state troopers sitting in the spectators' gallery, directly behind the accused, was not so inherently prejudicial that it denied the defendant a fair trial. This was because of "the wider range of inferences" that a juror might reasonably draw from their presence.[13]

These cases stand for the following proposition: When a courtroom practice is challenged as inherently prejudicial, the question is whether the practice (1) creates an unacceptable risk that the presumption of innocence will be eroded, and (2) does not further an "essential" state policy.[14] We have held that "inherent prejudice rarely occurs and 'is reserved for extreme situations.' "[15]

If a courtroom arrangement is not inherently prejudicial, then reviewing courts use a case-by-case approach to decide whether its use actually prejudiced the

6. *Estelle v. Williams*, 425 U.S. 501, 503, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).

7. *Id.*

8. *Hathorne v. State*, 459 S.W.2d 826, 834 (Tex.Crim.App.1970).

9. 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976).

10. *Id.* at 504, 96 S.Ct. 1691.

11. *Id.* at 503–04, 96 S.Ct. 1691.

12. 475 U.S. 560, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

13. *Id.* at 569, 106 S.Ct. 1340 ("While shackling and prison clothes are unmistakable indications of the need to separate a defendant from the community at large, the presence of guards at a defendant's trial need not be interpreted as a sign that he is particularly dangerous or culpable. Jurors may just as easily believe that the officers are there to guard against disruptions emanating from outside the courtroom or to ensure that tense courtroom exchanges do not erupt into vio-

lence. Indeed, it is entirely possible that jurors will not infer anything at all from the presence of the guards.").

14. *See* LeRoy Pernell, *The Reign of the Queen of Hearts: The Declining Significance of the Presumption of Innocence—A Brief Commentary*, 37 CLEV. ST. L.REV. 393, 395–409 (1989) (quoting Lewis Carroll's *Alice's Adventures in Wonderland*—" 'Let the jury consider their verdict' the King said ... 'No, no!' said the Queen. 'Sentence first-verdict afterwards.' "; discussing the history of the presumption and arguing that *Williams* left "open the door for the entry of the Queen of Hearts principle," and that "the Court made use of this opening in *Holbrook* "; "[t]he uncertainty surrounding when an 'unacceptable risk' exists creates a slippery slope down which it is easy to slide into a quagmire of suggestive courtroom setups that, while arguably meeting important governmental interests, directly and indirectly suggest guilt before trial").

15. *Howard v. State*, 941 S.W.2d 102, 117 (Tex. Crim.App.1996) (citation omitted), *overruled on other grounds by Easley v. State*, 424 S.W.3d 535 (Tex.Crim.App.2014).

defendant.[16] The "test to determine actual prejudice-the result of external juror influence-would be whether jurors actually articulated a consciousness of some prejudicial effect."[17] In other words, the defendant must show "a reasonable probability that the conduct or expression interfered with the jury's verdict."[18]

## III.

The Mothers Against Drunk Driving organization[19] is no stranger to courtroom controversy. A MADD-produced video has been played for jurors in an intoxication manslaughter trial.[20] MADD members have carried placards and signs during a trial.[21] Potential jurors are routinely asked, as they were in this case, whether they have ever contributed to MADD[22] so that they may be challenged for cause or struck peremptorily. A MADD representative became a fact witness after doing ride-along with a police officer on duty.[23] MADD has been a point of reference injury arguments.[24] MADD letters have been

16. *See Id.* (applying *Williams/Holbrook* rule to claim of "external juror influence"; finding neither inherent nor actual prejudice in the courtroom presence of twenty uniformed state troopers and police officers during final argument in the penalty phase of capital murder trial in which victim was a state trooper).

17. *Id.*

18. *Id.*

19. The current mission statement of MADD reads, "The mission of Mothers Against Drunk Driving is to stop drunk driving, support the victims of this violent crime and prevent underage drinking." MADD lists, among its victim services, that of "providing advocacy in the criminal and civil justice systems" and "accompanying victims/survivors to court." *See* http://www.madd.org.; *see also* Steven Grossman, *Hot Crimes: a Study in Excess*, 45 Creighton L.Rev. 33; 55 (Dec. 2011) (crediting MADD with playing a significant role in raising public concern about drunk driving by drawing attention to such things as the seriousness of the problem created by the drunk driver, the overly lenient sentences that many drunk drivers received, and the need for new legislation, but noting "a paradigm shift in recent years.... MADD has shifted from 'Don't drive drunk' to 'Don't drink and drive'.... For instance, MADD 'defines down' drunk driving by arguing that even low blood alcohol content ('BAC') while driving equate[s] to dangerous driving under the influence. MADD does this despite the fact that evidence suggests that driver fatality rates do not increase appreciably until a BAC reaches .1%.").

20. *People v. Diaz*, 227 Cal.App.4th 362, 173 Cal.Rptr.3d 594, 608–09 (2014) (reversible error to permit the jury to view 33 minute long MADD video that contained highly emotional footage of victims and their families discussing the impact of alcohol-related crashes, unrelated to the charged offense); *Eby v. State*, 702 P.2d 1047, 1050 (Okl.Crim.App.1985) (by failing to object, defendant forfeited complaints about presence of MADD members in the courtroom during the trial and the failure of the trial judge to properly admonish jury to disregard a television movie about drunk driving which aired during a recess).

21. *See Moreno v. State*, No. 04–01–00406–CR, 2002 WL 1573426, at *5 (Tex.App.—San Antonio July 17, 2002, no pet.) (not designated for publication) (defendant forfeited complaint about presence of members of MADD carrying placards and signs during trial by failing to object on the record).

22. *Railsback v. State*, 95 S.W.3d 473, 482 (Tex.App.—Houston [1st Dist.] 2002, pet. ref'd) (jurors asked if they had ever contributed to MADD or any other victim's rights organizations); *Morales v. State*, 875 S.W.2d 724, 725 (Tex.App.—Fort Worth 1994, no pet.) (same).

23. *See Slater v. State*, No. A14–89–001159–CR, 1991 WL 19827, at *1 (Tex.App.—Houston [14th Dist.] Feb. 14, 1991, no pet.) (not designated for publication) (noting that mistrial was granted after MADD representative attempted to testify that she had one child killed by a drunk driver and another that had, as a result, committed suicide).

24. *See People v. Chavez*, No. B198991, 2008 WL 4786654, at *5 (Cal.Ct.App. Nov. 4, 2008)

admitted into evidence.[25] And, with some frequency, spectators wearing MADD buttons come to DWI and intoxication manslaughter trials.[26]

In none of these cases, however, was the trial judge the source of the actual or figurative MADD presence.[27] Fortunately, there are few cases addressing the impropriety of a trial judge having special-interest group posters or plaques up in his or her courtroom.[28]

(not designated for publication) (upholding prosecutor's argument that defendant knew he would kill somebody because "Everybody knows.... I mean, we hear about this all the time, the horrors of drunk driving. That's why we have MADD.").

25. *State v. Hillier*, 132 Or.App. 40, 887 P.2d 845, 846 (1994) (reversible error to admit exhibit containing certified copies of administrative rules pertaining to alcohol breath testing and documentation that included letters from MADD relating to the promulgation of those rules).

26. *United States v. Sheffey*, 57 F.3d 1419, 1431–32 (6th Cir.1995) (noting the "troubling issues" of "the presence in the courtroom during the trial of some four to five members of anti-drunk-driving groups, all of whom were wearing noticeable buttons reflecting their cause" as well as an allegation that "these activists 'even went so far as to eat lunch with the jurors' during his trial," but finding no actual prejudice); *State v. McNaught*, 238 Kan. 567, 713 P.2d 457, 468 (1986) (holding defendant failed to show that he was prejudiced buttons by the presence of spectators in the courtroom wearing MADD buttons); *State v. Franklin*, 174 W.Va. 469, 327 S.E.2d 449, 451 (1985) (holding that presence of the spectators wearing MADD buttons led by uniformed sheriff, who was passing out buttons outside the courtroom, including at least one to a potential juror, was reversible error).

27. Courtroom practices may involve government-sponsored conduct or spectator conduct. In *Carey v. Musladin*, 549 U.S. 70, 127 S.Ct. 649, 166 L.Ed.2d 482 (2006), the Supreme Court addressed a habeas petitioner's claim that the presence of spectators in the courtroom wearing buttons with a photo of the alleged murder victim prejudiced his right to a fair trial. The defendant invoked the Supreme Court's cases "that certain courtroom practices are so inherently prejudicial that they deprive the defendant of a fair trial."

*Id.* at 72, 127 S.Ct. 649. But the prejudicial conduct involved in *Musladin* was courtroom conduct of private actors, and the Supreme Court held that the inherent prejudice test it had applied to cases involving government-sponsored conduct did not clearly extend to the conduct of courtroom spectators acting independently. *Id.* at 77, 127 S.Ct. 649. The Court recognized that federal and state courts are split on whether to extend the inherent prejudice test to private spectators' conduct. Because the question was an open one, it was not a grounds for relief under 28 U.S.C. § 2254. The Court's distinction has its critics. Padraic Foran, Note, *Unreasonably Wrong: the Supreme Court's Supremacy, the AEDPA Standard, and* Carey v. Musladin, 81 S. Cal. L.Rev. 571, 582 (2008) (arguing that the distinction between state and private action courtroom practices "is misplaced, because the source of disturbing courtroom behavior is meaningless both to the holder of the right-the accused-and to the body charged with enforcing that right-the trial court."). Texas is one of the states that has applied the inherent prejudice test to private spectators' conduct. *See supra* note 16.

28. *See ACLU of Ohio Foundation, Inc. v. DeWeese*, 633 F.3d 424, 435 (6th Cir.2011) (holding unconstitutional the courtroom display of a poster of the Ten Commandments and seven secular Humanist Precepts and "editorial comments" that link religion and secular government); *Tyler v. Nelson*, 163 F.3d 1222, 1229 (10th Cir.1999) (defendant's trial for murdering detective not rendered unfair by the state trial judge's decision not to remove or conceal memorial plaque to the dead detective from the courthouse lobby during trial; "Like the presence of guards at a defendant's trial, the plaque 'need not be interpreted as a sign that [Petitioner] is particularly dangerous or culpable.' The memorial plaque was small and therefore was not necessarily noticeable. Further, it was not located in the courtroom nor did it mention Petitioner's name. Although the plaque may have served as a reminder of a police officer's death, it did not

During the voir dire in a Louisiana case,[29] the trial judge displayed a three-and-a-half by two-and-a-half foot poster in his courtroom, depicting a grave with a cross on it, and the words ".You have the right to drink; You have the right to drive; You have the right to remain silent. Don't drink and drive; don't ride with anyone who does."[30] In that case, the trial judge took the poster down when requested, but he nevertheless likened the poster to a piece of furniture in the courtroom.[31]

The Louisiana court held that the presence of the poster was not inherently prejudicial because the exposure was short-lived and the trial judge had told the jury not to view the poster as a reflection of his opinion about the case. Nor did the poster's exhibition cause actual prejudice because the only prospective juror who indicated he associated the poster with the defendant's case said that he did not believe it would affect his decision. In so holding, the court disagreed with the State's argument that the poster was not a reflection of the judge's opinion on DWI:

> The poster was not hung outside the courtroom in the lobby; rather, it was hung over the witness stand next to the judge's bench and in the view of anyone in the courtroom. Furthermore, the courtroom is the judge's domain; and the judge is considered the dominant

person in that arena. It is conceivable and likely that persons viewing the DWI poster would associate it with the trial judge and view it as a reflection of the judge's opinion on DWI.[32]

· That observation mirrors what we said nearly a century ago: "Jurors are prone to seize with alacrity upon any conduct or language of the trial judge which they may interpret as shedding light upon his view of the weight of the evidence, or the merits of the issues involved."[33]

And like the Louisiana court, I believe that jurors would reasonably conclude that the plaque in this case reflected the trial judge's alignment with MADD. The plaque was not hung in his chambers where personal items belong. Rather, as appellant notes, the plaque was the only object displayed by the judge and sat directly below the court's official seal and between the United States and Texas flags. I agree with Justice Sharp that the public display of the MADD plaque "in what is to be a hallowed sanctuary of impartial justice bespeaks a fundamental misunderstanding of the very proprietorship of that public space: it is the people's courtroom, not an oversized ante-room of some judge's chambers."[34] Nevertheless, I agree with the court of appeals' majority

necessarily serve as a reminder of Petitioner's guilt or his special status as a defendant."); *Utley v. State,* 589 N.E.2d 232, 239 (Ind.1992) (trial not rendered unfair by denial of motion to cover courtroom mural "depicting the story of the judgment of Solomon, I Kings 4:16–28, whereby Solomon determines the true mother of an infant over which custody is disputed"); *Duffitt v. State,* 525 N.E.2d 607, 608 (Ind.1988) ("the practice of decorating in deference to certain witnesses is altogether inappropriate and has no proper place in our trial courtrooms").

29. *State v. Edwards,* 591 So.2d 748 (La.Ct. App.1991).

30. *Id.* at 751.

31. It is axiomatic that a courtroom is not the judge's living room for him to decorate as he pleases. It is the taxpayer's forum for dispensing justice to all citizens-defendants and victims alike.

32. *Edwards,* 591 So.2d at 755.

33. *Lagrone v. State,* 84 Tex.Crim. 609, 209 S.W. 411, 415 (1919).

34. *Simpson v. State,* No. 01–12–00380–CR, 2013 WL 6869923, at *26 (Tex.App.—Houston [1st Dist.] Dec. 31, 2013) (Sharp, J., dissenting) (not designated for publication).

that there was no actual harm shown in this case.

First, the plaque's presence was not "inherently prejudicial." It was relatively small, and blocked when Judge Harmon was sitting at the bench. The panel was told that the judge was the "neutral" ball-and-strikes caller, and defense counsel-in the midst of his objection to the plaque-said "Judge, I know you're very fair. I just would request and object to that sign being up there during this trial. I would ask ... respectfully that it be removed."

Like the presence of the uniformed state troopers in the gallery of the courtroom in *Holbrook v. Flynn*,[35] the conspicuous (or at least noticeably visible) display of a MADD plaque in a courtroom, even during a DWI trial, is not an inherently prejudicial practice that necessarily undermines the presumption of innocence and the fairness of the fact-finding process. Second, no juror articulated a consciousness of prejudicial effect.[36] Though several prospective jurors said that they supported MADD, or at least appreciated "what they are doing," none said that the plaque made them question the trial judge's impartiality. Although appellant did not show that the jurors at her trial were, in fact, influenced by the MADD plaque, such partisan displays in any public courtroom should be strongly condemned.

With these comments, I join in the Court's refusal of appellant's petition for discretionary review.

---

**35.** 475 U.S. 560, 569, 106 S.Ct. 1340, 89 L.Ed.2d 525 (1986).

**36.** Rule 606(b) was designed precisely for the purpose of inquiring of jurors after the trial whether such an "outside influence" affected the jury deliberations. A defendant may gather juror affidavits and sponsor juror testimony in a motion for new trial hearing to establish that plaques or other indicia of possible judicial favoritism affected the validity of the verdict. Tex.R. Evid. 606(b).