PD-0605-15
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 5/22/2015 9:51:02 AM
Accepted 5/22/2015 12:02:40 PM
ABEL ACOSTA
CLERK

NO._____

# IN THE COURT OF CRIMINAL APPEALS OF TEXAS
## AUSTIN, TEXAS

---

NO. 01-13-00900-CR
IN THE COURT OF APPEALS FOR THE
FOURTEENTH DISTRICT OF TEXAS
AT HOUSTON

---

TRIAL COURT NO. 1342490
IN THE 174TH DISTRICT COURT
OF HARRIS COUNTY, TEXAS

---

RAYMOND LEE CAVITT,
*Appellant*

VS.

THE STATE OF TEXAS,
*Appellee*

---

APPELLANT'S PETITION FOR DISCRETIONARY REVIEW

---

FILED IN
COURT OF CRIMINAL APPEALS

May 22, 2015

ABEL ACOSTA, CLERK

Nicole DeBorde
BIRES SCHAFFER AND DEBORDE
SBOT 00787344
712 Main Street, Suite 2400
Houston, Texas 77002
(713) 228-8500 – telephone
(713) 228-0034 – facsimile
Nicole@BSDLawFirm.com

Attorney for Appellant,
Raymond Lee Cavitt

## STATEMENT REGARDING ORAL ARGUMENT

Pursuant to TEX. R. APP. PROC. 68.4(c), appellant requests oral argument.

## TABLE OF CONTENTS

TABLE OF CONTENTS.....................................................................................i

INDEX OF AUTHORITIES............................................................................. ii

STATEMENT REGARDING ORAL ARGUMENT ...............................................i

STATEMENT OF THE CASE...........................................................................v

STATEMENT OF PROCEDURAL HISTORY.........................................…vi

GROUND FOR REVIEW NUMBER ONE.........................................................7

**Did the First Court of Appeals err in holding Appellant did not suffer harm when the trial court brought D.R., a material defense witness, into the courtroom handcuffed, and in a jail uniform?**

ARGUMENT .................................................................................................7

PRAYER FOR RELIEF ..................................................................................9

CERTIFICATE OF COMPLIANCE...................................................................10

CERTIFICATE OF SERVICE ..........................................................................11

APPENDIX................................................................................................. A-1

# INDEX OF AUTHORITIES

**<u>CASES</u>**                                                                **<u>PAGE</u>**

*Cavitt v. State*, No. 01-13-00900-CR, -- S.W.3d --, 2015 WL 1869499, *1 (Tex. App.—Houston [1st Dist.] Apr. 23, 2015, no pet h.).............................................6,7

*Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d126 (1976)................8

*Groh v. State*, 725 S.W.2d at 284–85 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd)..............................................................................................7

*Simpson v. State*, 447 S.W.3d 264, 266 (Tex. Crim. App. 2014).............................8

**<u>STATUTES AND RULES</u>**

Tex. R. App. P. 66.3........................................................................................9

Tex. R. App. P. 68.4........................................................................................1

## IDENTITY OF PARTIES AND COUNSEL

Pursuant to Tex. R. App. P. 68.4(a), a complete list of the names and all interested parties is provided below.

| | |
|---|---|
| Appellant: | Raymond Lee Cavitt,<br>TDCJ# 01897462<br>Michael Unit<br>2664 FM 2054<br>Tennessee Colony, Texas 75886 |
| Presiding Judge at Pretrial and<br>Voir Dire Proceedings: | Hon. Leslie Brock Yates<br>174th District Court<br>1201 Franklin<br>Houston, Texas 77002 |
| Presiding Judge: | Hon. Ruben Guerrero<br>174th District Court<br>1201 Franklin<br>Houston, Texas 77002 |
| Trial Prosecutors: | Stephen Driver<br>Gretchen Flader<br>Paul Fortenberry<br>Assistant District Attorneys<br>1201 Franklin<br>Houston, Texas 77002 |
| Defense Counsel at Trial: | William R. Gifford<br>Attorney at Law<br>1302 Waugh Drive<br>Houston, Texas 77019 |
| State's Counsel on Appeal: | Hon. Devon Anderson<br>Harris County District Attorney<br>1201 Franklin |

3

Houston, Texas 77002

Defense Counsel on Appeal:      Nicole DeBorde
Attorney at Law
Bires Schaffer & DeBorde
712 Main Street, Suite 2400
Houston, Texas 77002

TO THE COURT OF CRIMINAL APPEALS:

## STATEMENT OF THE CASE

Appellant was arrested on April 3, 2012, for sexual assault of a child. R.R., the alleged victim, was fifteen years old at the time of the trial and would go to Appellant's house with her best friend, D.R., who had a room at Appellant's house. (IV R.R. at 33, 47). R.R. went to Appellant's house almost every day, instead of going home after school, and stayed the night there once in a while. (IV R.R. at 49). On January 2, 2012, R.R. claims that she was at Appellant's house with D.R. in Appellant's room smoking and taking "handlebars", a type of drug, that day. (IV R.R. at 52, 53). Appellant left for a few hours and returned while R.R. was asleep. (*Id*.). According to R.R., Appellant was not there when R.R. fell asleep, but when she woke up, she was laying on her stomach, and Appellant was on top of her trying to penetrate her with his penis and his arms were "all over her body". (IV R.R. at 58-60; 85).

D.R. testified on Appellant's behalf but was brought into the courtroom and was present in front of the jury in handcuffs and a brown inmate jumpsuit. (VI R.R. at 3, 11-12) Defense counsel requested that the handcuffs be removed, the trial court obliged. (VI R.R. at 3). According to D.R., Appellant did not have anything to do with them smoking or doing handlebars. (VI R.R. at 11.) .

**STATEMENT OF PROCEDURAL HISTORY**

On June 14, 2012, Appellant was indicted for the offense of Sexual Assault of a Child in Cause No. 1342490. (C.R. at 35). Appellant was brought to trial on September 26, 2013. (III R.R. at 1). Appellant entered a plea of not guilty to the charges. (IV R.R. at 11). The jury found Appellant guilty on October 3, 2013. (VII R.R. at 3). The jury found the allegation in the enhancement paragraph true and sentenced Appellant to life in the Texas Department of Criminal Justice. (VII R.R. at 4-5.) Appellant filed a Motion for New Trial and Request for Evidentiary Hearing on November 4, 2013. (MNT[1]). The trial court signed an order of presentment on the motion for new trial on November 8, 2013. The trial court denied Appellant's Motion for New Trial and Request for Evidentiary Hearing on December 16, 2013. (IX R.R. at 24). Appellant gave timely notice of appeal. (C.R. 207, 209).

The First Court of Appeals affirmed the trial court's judgment. *Cavitt v. State*, No. 01-13-00900-CR, -- S.W.3d --, 2015 WL 1869499, *1 (Tex. App.— Houston [1st Dist.] Apr. 23, 2015, no pet h.). No motion for rehearing was filed. Appellant now timely petitions this Honorable Court for discretionary review. Appellant presents one (1) ground for review before this Honorable Court.

---

[1] Appellant's Motion for New Trial and Request of Evidentiary Hearing is cited as "MNT."

6

APPELLANT'S FIRST GROUND FOR REVIEW

**Did the First Court of Appeals decide an important question of state law that has not been, but should be, settled by the Court of Criminal Appeals in holding Appellant did not suffer harm when the trial court brought D.R., a material defense witness, into the courtroom handcuffed, and in a jail uniform?**

ARGUMENT

The First Court of Appeals erroneously held Appellant did not suffer harm when the trial court brought D.R., a material defense witness, into the courtroom handcuffed, and in a jail uniform such that review is warranted pursuant to Tex. R. App. P. 66.3(b). Appellant complained on appeal in Issue Number Four he was deprived of a fair trial because D.R. was brought into the courtroom in handcuffs and a jail uniform because doing so undoubtedly prejudiced her credibility.

In *Groh v. State*, the First Court of Appeals held harmless error analysis is applicable in cases where defense witnesses appear in jail clothing. *Groh*, 725 S.W.2d 282, 284–85 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (explaining although the court found error in allowing the witness to appear before the jury in jail clothing, without apparent justification for doing so, the error was harmless). The First Court reaffirmed the holding in *Groh* and applied it to the facts of this case. *See Cavitt v. State*, No. 01-13-00900-CR, -- S.W.3d --, 2015 WL 1869499, *6-7 (Tex. App.—Houston [1st Dist.] Apr. 23, 2015, no pet h.).

7

This Court has yet to address whether a harm analysis should be conducted or whether a making a material defense witness wear identifiable prison clothing at a defendant's jury trial denies him due process and equal protection because of "the possible impairment of the presumption of innocence so basic to the adversary system." *Compare Groh*, 725 S.W.2d at 284–85 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd) (explaining although the court found error in allowing the witness to appear before the jury in jail clothing, without apparent justification for doing so, the error was harmless); *with Simpson v. State*, 447 S.W.3d 264, 266 (Tex. Crim. App. 2014) (citing *Estelle v. Williams*, 425 U.S. 501, 96 S.Ct. 1691, 48 L.Ed.2d 126 (1976)) (explaining "[w]hen a courtroom practice is challenged as inherently prejudicial, the question is whether the practice: (1) creates an unacceptable risk that the presumption of innocence will be eroded, and (2) does not further an "essential" state policy.").

The harm analysis made applicable by the First Court of Appeals to this case by *Groh* should be abandoned by this Court in favor of the analysis found in Simpson. *See id*. Therefore, the proper analysis should focus on whether D.R.'s appearance before the jury while handcuffed and in a prison uniform (the courtroom practice) was inherently prejudicial to the defendant. See *id*.

In conducting a harm analysis and holding any error allowing D.R. to appear in jail garb was harmless to Appellant, the First Court of Appeals decided an

8

important question of state law that has not been, but should be, decided by this Court. Accordingly, review is warranted pursuant to Tex. R. App. P. 66.3(b).

PRAYER FOR RELIEF

WHEREFORE, PREMISES CONSIDERED, Appellant prays that this Honorable Court grant this Petition for Discretionary Review. Following the grant of review, Appellant prays that the judgment of the Court of Appeals be reversed and rendered, or reversed and a new trial ordered, or the case remanded for further review.

Respectfully submitted,

*/s/ Nicole DeBorde*
Nicole DeBorde
BIRES SCHAFFER AND DEBORDE
Texar Bar No. 00787344
712 Main Street, Suite 2400
Houston, Texas 77002
(713) 228-8500 – Telephone
(713) 228-0034 – Facsimile
Email: Nicole@BSDLawFirm.com

Attorney for Appellant,
Raymond Cavitt

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule 9 of the Texas Rules Appellate Procedure, the undersigned counsel of record certifies that the Petition for Discretionary Review contains 1580 words.

*/s/ Nicole DeBorde*
Nicole DeBorde

## CERTIFICATE OF SERVICE

I hereby certify that a true copy of Appellant's petition for discretionary review has been either personally served upon or mailed by U.S. Postal Service certified mail, return receipt requested, on May 22, 2015 to the following persons:

Devon Anderson
District Attorney
1201 Franklin, Suite 600
Houston, Texas 77002


Alan Curry, Assistant District Attorney
Appellate Section
1201 Franklin, Suite 600
Houston, Texas 77002


State Prosecuting Attorney
P.O. Box 12405
Austin, Texas 78711

Respectfully submitted,


*/s/ Nicole DeBorde*
Nicole DeBorde

11

**APPENDIX**

**Opinion issued April 23, 2015**



In The

# Court of Appeals

For The

# First District of Texas

———————————

## NO. 01-13-00900-CR

———————————

**RAYMOND LEE CAVITT, Appellant**

**V.**

**THE STATE OF TEXAS, Appellee**

**On Appeal from the 174th District Court**
**Harris County, Texas**
**Trial Court Case No. 1342490**

## O P I N I O N

Appellant Raymond Lee Cavitt appeals his conviction for sexual assault of a child. We affirm.

# BACKGROUND

## A.     Trial Testimony

R.R., the 14-year-old complainant,[1] testified that she met the 59-year-old appellant through a classmate, D.R., who lived with appellant.  R.R. and D.R. had been friends since third grade, and R.R. started spending time at appellant's apartment with D.R. when they were in the eighth grade.  R.R. initially thought that appellant and D.R. were related because appellant called D.R. his granddaughter, and D.R. referred to appellant as her grandfather.

R.R. testified that D.R. had her own bedroom both at appellant's apartment and at D.R.'s mother's house.  Most days, R.R. and D.R. would go to appellant's apartment after school.  R.R. and D.R. would "chill and smoke" marihuana there. Appellant supplied marihuana and other drugs to D.R., which D.R. in turn shared with R.R.  R.R. would occasionally spend the night with D.R., and they would alternate these sleepovers between appellant's place and D.R.'s mother's nearby house.  Usually, when R.R. stayed with D.R., they would sleep in D.R.'s bedroom.

R.R. testified that, on January 2, 2012, she and D.R. were smoking in appellant's bedroom room.  They were in appellant's room because the furniture had recently been removed from D.R.'s bedroom by a relative that moved out of the apartment, leaving only appellant's bed in the apartment.  Appellant was there,

---

[1]     She was 14 years' old at the time of the sexual assault, and 15 years' old at the time of trial.

and gave D.R. a drink containing "handlebars," a slang term for prescription Xanax. Appellant left for a few hours, during which time D.R. drank most of the drink, and gave the remainder to R.R. D.R. and R.R. then feel asleep on appellant's bed.

R.R. later woke with the weight of appellant lying on top of her. She testified that she was laying on her stomach, her pajama bottoms had been pulled down around her ankles, her socks pulled off, and she felt pain from appellant trying to force his penis into her vagina. When R.R. demanded to know what he was doing, appellant moved away and said, "I'm just playing with you." Although it was dark, R.R. saw appellant clearly, and she testified that he was wearing a blue shirt and no pants. After unsuccessfully trying to rouse D.R., R.R. went to an apartment upstairs where some of appellant's relatives live.

Upstairs, R.R. told appellant's niece, Dee, and appellant's granddaughter, Gabriale, what appellant had done and that she was unable to wake D.R. before she fled appellant's apartment. Dee and Gabriale then went down to appellant's apartment and Gabriale carried a sleeping D.R. back upstairs to their apartment. Dee or Gabriale called D.R.'s mother, Juanita, who sent her boyfriend, Germane, to pick up D.R. and R.R. and take them back to Juanita's house.

R.R. testified that she did not call her mother to tell her what appellant had done because she was scared and did not want her mother to know that she was

3

doing drugs. When R.R. returned home the following day, however, she told her mother what had happened. Her mother accompanied her to school and told the principal, who in turn contacted the police. R.R. was uncooperative when the first officer tried to interview her, but she eventually talked with a different officer and was then interviewed and examined at the Children's Assessment Center.

R.R. testified that, about one year later, D.R. and Gabriale pressured her to recant her accusation against appellant. Specifically, on January 28, 2013, D.R. wrote out a statement for R.R. and told R.R. to copy it in her own handwriting and sign it. R.R. did so, but testified at trial that she signed the statement only because she had been feeling pressure from appellant's friends and family to "make this go away." She reiterated at trial that despite her written recantation, her original accusations against appellate were true.

The State also presented testimony from the investigating police officer and a doctor from the Children's Assessment Center about their interviews with R.R. The director of therapy and psychological services from the Children's Assessment Center also testified about ways in which a sexual predator will groom children of different ages, and the characteristics of certain targets.

The defense called Gabriale, who also testified about the events of January 2, 2012. Gabriale and Dee had gone to see appellant at his apartment that evening, and had seen D.R. and R.R. sleeping in appellant's bed. While there, Gabriale

4

expressed to Dee that she was concerned about the girls sleeping in appellant's bed given that appellant has a history as a sex offender.

According to Gabriale, it was only about five minutes after she and Dee returned upstairs to their apartment that R.R. appeared banging on their door. R.R. was visibly shaken and told them that appellant had tried to molest her. Gabriale noticed that R.R. no longer had on the socks Gabriale had seen her wearing when she saw R.R. in appellant's bed. R.R told Gabriale that R.R. had tried to penetrate her and that it was painful. R.R. told Gabriale that she did not want to call the police or her mother because she had been doing drugs, but that she was upset that D.R. was still passed out in appellant's apartment. Gabriale testified about her and Dee going to retrieve D.R., carrying her upstairs, and then calling Juanita to have someone come pick up D.R. and R.R. Gabriale testified to seeing R.R. and D.R. at appellant's apartment the following day. Finally, Gabriale explained that after she and D.R. ran into R.R. about a year later, they took R.R. back to Gabriale's apartment to write a retraction letter. Gabriale admitted to "proofread[ing] it only," but denied that she or D.R. assisted R.R. in writing it.

Appellant testified on his own behalf. He testified to several prior convictions that led to a total of thirty-five years of incarceration, including a sixteen-year sentence for sexual assault. He explained that he had pleaded guilty

5

to previous offenses because he was guilty, but that he was not guilty of the current charge.

Appellant testified that D.R.'s mom, Juanita, is his hospice provider. Among other ailments, he suffers from Hepatitis B and C, asthma, lung cancer, bone cancer, and diabetes. In his bedroom, he has oxygen tanks, a computer, and a headboard shelf that holds his medications. He denied allowing anyone to smoke anywhere in his apartment.

Appellant lets D.R. live with him because Juanita cannot control her behavior. R.R. spent a lot of time at appellant's apartment because she was friends with D.R., but appellant has made R.R. go home before. Appellant denied using any drugs that have not been properly prescribed, or giving drugs to anyone in his apartment.

Appellant testified that, on January 2, 2012, he got up about 6:30 a.m. and drove himself to Juanita's apartment, where he stayed until about 2:00 a.m. the next morning. When he returned to his apartment, he cleaned up his kitchen, and Gabriale and Dee came by to visit. After they left, he went in his room, took his medicine, and laid down. He saw D.R. in his bed, but testified that he did not see R.R. at all that day. He said that there was furniture in D.R.'s room on that date, but testified that he did not ask D.R. to move to her own bed because the air conditioner in his room was better. He also testified that some nights D.R. gets up

in the middle of the night and comes to sleep in his room because she is scared or hears voices. He also denied owning a blue shirt.

Appellant dropped off to sleep and testified that he woke up when Dee came in and started shaking him. Dee told him "that girl" said somebody touched her. Appellant claims he did not know who "that girl" was, but that he immediately grabbed his phone and called 911 to report it. By the time the police arrived, appellant had learned from Dee that it was R.R. that claimed she was touched. When the police came out, appellant told them that he had not seen a girl in his apartment that day except D.R., and that he wanted to file a complaint.

Appellant testified that he heard noise outside when Juanita's boyfriend picked up D.R. and R.R., so he went outside and saw R.R. and D.R. getting into the car. That is the only time he saw R.R. and he testified that she was wearing a school uniform, not pajama pants.

Appellant testified that he left his apartment again on the morning of January 3, 2012, returning home about 4:30 in the afternoon. When he arrived back at his apartment, D.R. and R.R. were there. Appellant testified that he "spoke to" R.R., who told him "I didn't say you did that." According to appellant, D.R. and R.R. stayed that night in D.R.'s bed in D.R.'s bedroom. Appellant went into his room and locked his door for the night. The next morning, appellant gave R.R. some of his pants to wear to school because she did not have a clean school uniform.

7

Sometime later, R.R.'s mother came to his apartment and confronted him. A few days after that, a police officer asked appellant to come in to be interviewed. Appellant took written statements by his brother and Juanita to give to the police.

Appellant testified that he did not attempt to molest R.R. He claimed that his bedroom would have been too dark for R.R. to identify him, and that his medications prevent him from maintaining an erection.

Appellant was cross-examined about several inconsistencies between his trial testimony and earlier interviews with police. For example, contrary to his testimony at trial that he could not get an erection, he told police that his medication interfered with erections "sometimes," that he was sexual active, and that he had had sex one week before the alleged January 2, 2012 assault.

Although D.R. and Juanita were subpoenaed and sworn in the first day of trial, they did not return to testify during appellant's case. Accordingly, after appellant testified, the trial court granted the defense a continuance until the following morning, and it issued attachments for D.R. and Juanita. It was eventually discovered that Juanita was out of town for work. D.R. was finally located and showed up at the courthouse several hours late where she was detained. After D.R. told the court that her mother was not available to come pick her up, the court then ordered her held in juvenile confinement so she could testify the next day. When D.R. was brought into court the following morning to testify,

she was in handcuffs and in a brown jumpsuit. At defense counsel's request and in front of the jury, the court noted that D.R. was not charged with a crime and ordered her handcuffs removed.

D.R. testified that she lived with appellant for a couple of years and that he never touched her inappropriately. Contrary to appellant's testimony, she testified that there was not a bed in her bedroom on January 2, 2012. She and R.R. smoked marihuana all that day in appellant's bedroom while appellant was gone. D.R. denied that appellant gave drugs to her, testifying instead that she helped herself to appellant's Xanax when he was not there, and that she gave one to R.R. at R.R.'s request on January 2, 2012. She could not recall if she fell asleep first or R.R. fell asleep first in appellant's bed that night. D.R. did not wake up until after Gabriale carried her upstairs. She thus testified that she did not have any firsthand knowledge of anything that happened to R.R. while she was asleep. D.R. testified that she and R.R. went to her mother's house later that night. She also testified that R.R. told everyone that appellant "raped me . . . He tried to stick it in."

The next day, according to D.R., she and R.R. went back to appellant's apartment. She said R.R. did not want to go home and instead wanted to stay wherever D.R. was. D.R. and R.R. stayed at appellant's that night, and went to school the next morning. D.R. provided R.R. a pair of appellant's shorts to wear to school because R.R. did not have any clean clothes.

9

D.R. testified that she was there at Gabriale's house in January 2013 when R.R. wrote out and signed the letter recanting her accusations against appellant. D.R. denied that she or Gabriale told R.R. what to put in the letter.

The defense rested, noting that it made a decision not to call Juanita and that it was withdrawing the motion for continuance based on the need to get her testimony.

## B.     The Verdict and Judgment

The jury found appellant guilty of sexual assault of a child.  At the punishment phase, the State provided evidence on a prior felony sexual assault in support of an enhancement that the jury found to be "true."  Based on the guilty verdict and the enhancement, appellant was given a mandatory life sentence.

## C.     The Motion for New Trial

Appellant filed a motion for new trial alleging the following grounds and attaching numerous affidavits in support:

1.     Trial counsel was ineffective at the pre-trial and guilt-innocence stages because counsel failed to (a) conduct an independent investigation, (b) seek out and interview material witnesses, (c) secure experts, (d) adequately prepare appellant to testify at trial, (e) subpoena material witnesses, (f) adequately discuss with appellant whether he should testify, (g) elicit testimony from Gabriale that R.R. told her three or four weeks after the alleged incident that she made up her allegations, (h) elicit testimony from D.R. that Dee and Gabriale told R.R. to get appellant in trouble, or (i) adequately support a defense motion for continuance with sworn evidence.

2. Trial counsel was ineffective at the punishment phase because counsel failed to (a) adequately prepare appellant to testify at the punishment phase, (b) present evidence in mitigation of punishment, or (c) interview and call available punishment witnesses.

3. The court should have granted his motion for a speedy trial.

4. The court erred in having D.R., a defense witness, testify in a jail uniform and handcuffs.

5. There is newly discovered evidence because Dee told a relative that she wanted to change her statement to police because her earlier statement was not true.

6. A new trial would be in the interest of justice.

At the motion-for-new-trial hearing, the court admitted into evidence all of the exhibits appended to appellant's motion for new trial, as well as an affidavit by appellant's trial counsel introduced by the State. Appellant's counsel objected to the trial court's failure to hold an evidentiary hearing for the parties to present and cross-examine live witnesses. After allowing each side to argue from the admitted evidence, the trial court overruled appellant's motion for new trial.

## ISSUES ON APPEAL

Appellant raises the following issues on appeal:

1. "Appellant received ineffective assistance of counsel."

2. "The trial court erred in denying Appellant's motion for a speedy trial."

3. "The trial court erred by failing to grant an evidentiary hearing on the Motion for New Trial."

4. "The trial court erred by bringing a material defense witness, [D.R.,] into the courtroom, handcuffed, and in a jail uniform."

11

5. "A new trial should have been granted based on newly discovered evidence."

## SPEEDY TRIAL

In his second issue, appellant argues that the "trial court erred in denying Appellant's motion for a speedy trial." Appellant was charged and arrested in April 2012. On August 19, 2013, while represented by counsel, appellant filed a *pro se* "Writ of Habeas Courp. [sic] under 1107 VACCP for a Speedy Trial by Jury." In that filing, appellant asserts he has made four requests for the case to go to trial, and that the delay has caused him to lose contact with "one or more of his witnesses." The only relief sought is a request that the "court grant this motion for speedy trial." He included a proposed order, which the court signed on August 20, 2014 after checking a box that the motion should be "denied."[2] Trial began just over a month later, on September 26, 2014.

The State contends that the trial court's denial was proper, as a pre-trial writ is not the appropriate method of raising a speedy-trial claim. *Smith v. State*, 36 S.W.3d 134, 136 (Tex. App.—Houston [14th Dist.] 2000, pet. ref'd). The State also argues that it is "unlikely that the appellant would have benefited from the trial court treating this document as a motion and granting it" because appellant

---

[2] The trial court was not required to rule on appellant's pro se motion because appellant was represented by counsel. Because, however, the trial court ruled on the motion, we review that ruling here. *Robinson v. State*, 240 S.W.3d 919, 922 (Tex. Crim. App. 2007).

12

asked only for a speedy trial, not a dismissal. Trial was had five weeks after the motion's denial.

The Sixth Amendment to the United States Constitution guarantees an accused the right to a speedy trial. *Cantu v. State*, 253 S.W.3d 273, 280 (Tex. Crim. App. 2008). "A speedy trial protects three interests of the defendant: freedom from oppressive pretrial incarceration, mitigation of the anxiety and concern accompanying public accusation, and avoidance of impairment to the accused's defense." *Id*.

The speedy-trial right attaches when the defendant is arrested or charged. We analyze speedy-trial claims under four factors articulated by the Supreme Court in *Barker v. Wingo*: 1) length of the delay, 2) reason for the delay, 3) assertion of the right, and 4) prejudice to the accused. 407 U.S. 514, 530, 92 S. Ct. 2182, 2192 (1972). While the State has the burden of justifying the length of delay, the defendant has the burden of proving the assertion of the right and showing prejudice. *Cantu*, 253 S.W.3d at 280. The defendant's burden of proof on the latter two factors "varies inversely" with the State's degree of culpability for the delay. *Id*.

This case's pre-trial delay of almost 18 months is long enough to be presumptively prejudicial, thereby triggering the *Barker* test. *See Cantu*, 253 S.W.23d at 281 (recognizing that "no set time element triggers this analysis";

13

seventeen months is sufficient to trigger, but four months is not). When reviewing a trial court's denial of relief on a speedy-trial claim, "we presume that the trial judge resolved any disputed fact issues in the State's favor, and we defer to the implied findings of fact that the record supports." *Id.* at 282. Once the *Barker* test is triggered, courts must analyze the speedy-trial claim by first weighing the strength of each of the *Barker* factors and then balancing their relative weights in light of "the conduct of both the prosecution and the defendant." *Id*. at 281.

Here, there is no evidence that appellant asserted his right to a speedy trial before filing his writ of habeas corpus in August 2014, a full 16 months after his arrest and five weeks before trial. The record contains numerous case reset forms, but no motion by either party to reset the case. The docket sheet indicates that two months before appellant filed his August 2014 writ of habeas corpus seeking a speedy trial, the trial had been "reset by agreement of both parties" from June 24, 2013 to September 9, 2014. The docket sheet also indicates that several of the previous resets were done at defendant's request. Finally, although appellant argues that he was prejudiced by the delay because he lost track of witnesses, he provided no evidence to the trial court is support of this assertion.

In sum, even if the trial court interpreted appellant's writ of habeas corpus as a motion for speedy trial, the record indicates that appellant did not assert his right to a speedy trial until five weeks before trial and just shortly after he had agreed to

14

a trial resetting. *See id.* at 283–84 ("[D]efendant's assertion of his speedy-trial right (or his failure to assert it) is entitled to strong evidentiary weight in determining whether the defendant is being deprived of the right . . . . Repeated requests for a speedy trial weigh heavily in favor of the defendant, while the failure to make such requests supports an inference that the defendant does not really want a trial."). Appellant did not present any evidence of prejudice to his defense, and the record evidence about who was responsible for the trial delay is at best neutral.[3] Appellant has not demonstrated that his right to a speedy trial was violated. We overrule appellant's second issue.

## HANDCUFFED WITNESS

In his fourth issue, appellant argues that the "trial court erred by bringing a material defense witness, [D.R.], into the courtroom, handcuffed, and in a jail uniform." The State responds that appellant has not shown any action by the trial court, given that there is no evidence that the trial court was aware or ordered that D.R. be brought to court in handcuffs or jail attire. Moreover, the State contends, appellant cannot show harm, as "D.R. destroyed her own credibility in other ways and her testimony was not important anyway."

Requiring a *defendant* to be tried in jail clothing infringes upon the fundamental right to a presumption of innocence. *Estelle v. Williams*, 425 U.S.

---

[3] And if we take into account the docket sheet notes, it was appellant, rather than the State, that was responsible for much of the trial delay.

501, 512, 96 S.Ct. 1691, 1697 (1976). "But this same presumption of innocence does not apply to *accomplice (or codefendant) witnesses* because they are not on trial." *Gibson v. State*, 233 S.W.3d 447, 453 (Tex. App.—Waco 2007, no pet.) (emphasis added) (citing *Craig v. State*, 761 S.W.2d 89, 93–94 (Tex. App.—Beaumont 1988, no pet.). It is within the trial court's discretion to require a witness to appeal in jail clothes and restraints if the circumstances warrant. *Id.* (citing *Thompson v. State*, 514 S.W.2d 275, 277–78 (Tex. Crim. App. 1974)); *Groh v. State*, 725 S.W.2d 282, 284–85 (Tex. App.—Houston [1st Dist.] 1986, pet. ref'd). If we find error in a trial court's ordering a witness to testify in jail attire, we must review for harm to determine if such error is reversible. *Groh*, 725 S.W.2d at 285 ("Although we find error in allowing the witness to first appear before the jury in jail clothing, without apparent justification for doing so, the error was harmless.").

Here, our review of the record does not support appellant's argument that D.R.'s credibility was harmed by her jail attire and that his defense was in turn harmed. D.R. was in handcuffs and jail attire because she ignored subpoenas to appear as a witness in court, and then did not have a ride home when she finally appeared late in the afternoon after the court had granted a continuance to secure her appearance. She was kept in juvenile detention overnight pursuant to a witness warrant, and brought to court the following morning. When appellant called her to

16

the stand, appellant's counsel requested—in open court and in front of the jury—that D.R.'s handcuffs be removed. The trial court responded "She's not charged with anything. We can take those off her hands right now."

During her testimony, D.R. was later asked about her the circumstances of her detention. She explained that she was in a brown jumpsuit, "[n]ot [because] I did anything wrong," but because she had been unable to get a ride to the courthouse. Specifically, she explained that her mother was out of town, and she had to wait for the person she is staying with to bring her after work. She testified that she got there as soon as she could.

We agree with the State that D.R.'s credibility was likely undermined in other ways. She admitted to doing drugs and was combative during questioning, drawing repeated admonishments from the trial court to calm down. Most of D.R.'s testimony was cumulative. She testified that she had no first-hand knowledge of what had happened to R.R. because she was asleep.

Given these facts, we are confident that any error in allowing D.R. to appear in jail garb was harmless to appellant. *Groh*, 725 S.W.2d at 285. We overrule appellant's fourth issue.

**HEARING ON MOTION FOR NEW TRIAL**

In his third issue, appellant argues that the "trial court erred by failing to grant an evidentiary hearing on the Motion for New Trial." The State points out

17

that the trial court held a motion-for-new-trial hearing, accepted evidence in the form of affidavits, and heard argument from counsel. We agree with the State that the law requires nothing more. *See* TEX. R. APP. P. 21.7; *Holden v. State*, 201 S.W.3d 761, 763 (Tex. Crim. App. 2006) ("A trial court abuses its discretion in failing to hold a hearing when a defendant presents a motion for new trial raising matters not determinable from the record. But a trial court may rule based on sworn pleadings and affidavits without oral testimony; live testimony is not required."); *Scaggs v. State*, 18 S.W.3d 277, 281 (Tex. App.—Austin 2000, pet. ref'd) ("It has long been held that a trial court may decide a motion for new trial based on sworn pleadings and affidavits admitted in evidence *without* hearing oral testimony."). We overrule appellant's third issue.

## NEWLY DISCOVERED EVIDENCE

In his fifth issue, appellant argues that "a new trial should be granted based on newly discovered evidence." Specifically, he argues that Dee informed a family member, Laverne, after trial that "she wanted to change her statement to the police" to say that she did not expect it would all go this far and that her previous statement to police was not true. Appellant argues that this evidence was not available before trial and that it is important because "this evidence would be admissible to impeach [R.R.]."

18

In response, the State first notes that Laverne is not referenced anywhere in the record and that appellant did not proffer an affidavit from Laverne in support of his assertion about her allegedly newly discovered testimony. The State also notes that appellant's allegation that Dee "wanted to change her statement" is so vague as to be meaningless. Finally, the State points out that testimony by Laverne that Dee wanted to change her statement to police would not be admissible to impeach R.R., and that it would not qualify as "newly discovered," as appellant's counsel's affidavit reflects he knew that Dee wanted to change her statement to police before trial.

To demonstrate a right to a new trial based upon newly discovered evidence, appellant must show "(1) the newly discovered evidence was unknown or unavailable to the defendant at the time of trial; (2) the defendant's failure to discover or obtain the new evidence was not due to the defendant's lack of due diligence; (3) the new evidence is admissible and not merely cumulative, corroborative, collateral, or impeaching; and (4) the new evidence is probably true and will probably bring about a different result in a new trial." *Carsner v. State*, 444 S.W.3d 1, 2–3 (Tex. Crim. App. 2014).

We agree with the State that appellant has not demonstrated a right to a new trial based upon newly discovered evidence. Appellant claims that Laverne had information about the veracity of Dee's statement to police. Although it is unclear

19

from the record who Laverne is, appellant's counsel states in his affidavit that he interviewed another of appellant's family members, Dorothy, and that he learned that Dorothy had "information about the testimony of" Dee. After "carefully questioning" Dorothy, appellant's counsel concluded that "her testimony would only be of value to impeach [Dee's] testimony." Because Dee did not testify at trial, counsel concluded that Dorothy's "testimony would not be valuable and would, in all likelihood, be severely limited because her information was solely based on hearsay."

The record does not support appellant's assertion here that there is newly discovered evidence about whether Dee's statement to police was true; instead, the record demonstrates that appellant's counsel knew about this before trial through his interviewing Dorothy. Because Dee did not testify, appellant cannot establish that any testimony (be it from Laverne, Dorothy, or another witness) casting doubt on the truth of *Dee's* statement to policy would be admissible as impeachment testimony.

Because appellant cannot establish that Dee's allegedly wanting to change her statement to police was newly discovered evidence or that it would be admissible in light of the fact that Dee did not testify, we overrule appellant's fifth issue.

20

# INEFFECTIVE ASSISTANCE OF COUNSEL

In his first issue, appellant argues that his trial counsel was ineffective in by (1) improperly informing the jury that appellant had already been incarcerated for 542 days, (2) failing to adequately inform appellant about the advantages and disadvantages of testifying, (3) failing to challenge or strike a venireperson, (4) failing to secure the presence of material witnesses at trial, (5) failing to elicit testimony to demonstrate a motive for R.R. to fabricate her allegations, (6) failing to object to inadmissible expert testimony about appellant's likelihood of reoffending during the guilt-innocence stage of trial, (7) introducing evidence about appellant's prior remote convictions and failing to obtain a ruling regarding the admissibility of appellant's prior convictions, (8) eliciting inadmissible facts regarding appellant's prior convictions, and (9) failing to object to the State's questioning appellant as to details of his previous sexual assault conviction.

## A.    Standard of Review

The Sixth Amendment to the United States Constitution guarantees the right to reasonably effective assistance of counsel in criminal prosecutions. *See* U.S. CONST. amend. VI. To show ineffective assistance of counsel, a defendant must demonstrate both (1) that his counsel's performance fell below an objective standard of reasonableness and (2) that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been

21

different. *Strickland v. Washington*, 466 U.S. 668, 687–88, 694, 104 S. Ct. 2052, 2064, 2068 (1984); *Andrews v. State*, 159 S.W.3d 98, 101–02 (Tex. Crim. App. 2005). Failure to make the required showing of either deficient performance or sufficient prejudice defeats the ineffectiveness claim. *See Williams v. State*, 301 S.W.3d 675, 687 (Tex. Crim. App. 2009); *Andrews*, 159 S.W.3d at 101.

Appellant bears the burden of proving by a preponderance of the evidence that his counsel was ineffective. *Thompson v. State*, 9 S.W.3d 808, 813 (Tex. Crim. App. 1999). Any allegation of ineffectiveness must be firmly founded in the record, and the record must affirmatively demonstrate the alleged ineffectiveness. *Id*. We presume that a counsel's conduct falls within the wide range of reasonable professional assistance, and we will find a counsel's performance deficient only if the conduct is so outrageous that no competent attorney would have engaged in it. *Andrews*, 159 S.W.3d at 101.

The Court of Criminal Appeals has stated that "[i]n making an assessment of effective assistance of counsel, an appellate court must review the totality of the representation and the circumstances of each case without the benefit of hindsight." *Lopez v. State*, 343 S.W.3d 137, 143 (Tex. Crim. App. 2011). The court further admonished that demonstrating ineffective assistance of counsel on direct appeal is "a difficult hurdle to overcome." *Id*. "[T]he record must demonstrate that counsel's performance fell below an objective standard of reasonableness as a

matter of law, and that no reasonable trial strategy could justify trial counsel's acts or omissions, regardless of his or her subjective reasoning." *Id.*

## B. Analysis

Only three of appellant's nine ineffective-assistance arguments were made in the trial court. We review those claims separately from the ones raised for the first time on appeal.

### 1. Arguments made in Appellant's Motion for New Trial

The trial court rejected several of appellant's ineffective assistance of counsel complaints by overruling his motion for new trial in which those arguments were raised. We therefore analyze those previously raised ineffective assistance of counsel issue as a challenge to the denial of his motion for new trial. *Charles v. State*, 146 S.W.3d 204, 208 (Tex. Crim. App. 2004) (appropriate standard of review for ineffective assistance claim brought forth in motion for new trial is abuse of discretion); *see also Schoenbauer v. State*, 85 S.W.3d 400, 402 (Tex. App.—Tyler 2002, no pet.) ("When the appellant has presented evidence on his counsel's alleged ineffectiveness at a hearing on a motion for new trial, we review the application of the test pronounced in *Strickland v. Washington*, 466 U.S. 668, 104 S. Ct. 2052, 80 L.Ed.2d 674 (1984), through the prism of an abuse of discretion standard."). We reverse only if the trial court's decision is arbitrary or

unreasonable, viewing the evidence in the light most favorable to the ruling. *Charles*, 146 S.W.3d at 208.

### a. appellant's decision to testify

Appellant argues that the trial court should have granted his motion for new trial because defense counsel did not adequately inform him about the advantages and disadvantages of testifying. Specifically, he complains that he "has a criminal history including a previous sexual assault conviction among other serious convictions," but that counsel "failed to discuss with Appellant that his prior criminal history could be revealed to the jury if he decided to testify."

Trial counsel's affidavit, presented to the trial court by the State in response to appellant's motion for new trial, stated that, "from the onset, Raymond Cavitt made it clear to me that he wished to testify at trial" despite being repeatedly cautioned "about the dangers of testifying when he was charged with a sexual offense and had a prior conviction for a sexual offense, but he persisted." It further stated that counsel met with appellant several times specifically to discuss whether his testifying was prudent. At these meetings, counsel walked appellant through his direct examination questions, as well as what counsel anticipated cross-examination would entail. Finally, counsel's affidavit represents that he "specifically told [appellant] that his criminal history would, in all likelihood, be divulged to the jury if he testified." According to defense counsel, after discussing

24

appellant's criminal history and what would be brought out, appellant "indicated a thorough understanding of the risk and still insisted on testifying."

The record also reflects that defense counsel, outside the presence of the jury, verified that appellant wished to testify. While being questioned on the record, appellant stated that he understood that he would be subjected to a rigorous cross-examination and that he still wanted to testify. The Court of Criminal Appeals has held that, in ruling on a motion for new trial, the trial court may resolve factual disputes on conflicting affidavits, especially when the parties and counsel have personally appeared before the trial court and the court is familiar with the historical facts. *See Holden v. State*, 201 S.W.3d 761, 764 (Tex. Crim. App. 2006). Counsel's affidavit contradicts appellant's assertion that counsel did not inform him about the advantages and disadvantages of testifying and the trial court could have credited counsel's assertion that appellant was informed. The trial court did not abuse its discretion in failing to grant a new trial on this point.

### b. R.R.'s motives to lie

Appellant next argues that his counsel was ineffective in failing to "elicit testimony to demonstrate a motive for [R.R.] to make up this allegation." According to appellant, R.R. told Gabriale several weeks after the alleged sexual assault that she made up the allegation because she "was upset." Appellant argues

that his counsel knew about this and should have elicited that fact from Gabriale during her trial testimony.

Relatedly, appellant contends that D.R. gave an earlier statement that R.R. was mad at appellant because appellant kept telling R.R. to call her mother and to leave appellant's apartment. D.R. also stated that, because Dee and Gabriale were mad at appellant for making them move out of his apartment, they told R.R. to get appellant in trouble. Appellant argues that his counsel should have elicited these facts from D.R. during her testimony to demonstrate R.R.'s motive to lie.

Appellant's counsel does not address these allegations in his affidavit. We agree with the State, however, that (to the extent this facts did not come out at trial in other ways) it is "impossible to stich these statements together in such a way as to create plausible testimony" of motive that would have had a reasonable probability of altering the jury's verdict.

First, much of this "motive" evidence was actually before the jury. Gabriele, Dee, and appellant all testified that appellant frequently made R.R. go home when she did not want to. During appellant's testimony, he parlayed that into a motive theory:

> Q. Okay. Now, you offered an explanation for why you thought R.R. -- you said R.R. made all this up, right?
> A. Yes, she made it up.
> Q. You said -- I think you told the officer that the reason she made it up is because you made her go home?

26

A.    I made her go home several times.

Q.    So, on this particular occasion she decided to make up an allegation of sexual abuse?

A.    Yeah. She didn't want to go home.

Gabriale and appellant testified that Dee and Gabriale moved out of appellant's apartment at appellant's insistence because they were not getting along with appellant. Appellant argues that, according an out-of-court statement made by D.R., Dee and Gabriale were "mad at Appellant and told [R.R.] to get Appellant in trouble with this accusation." But, as the State points out, this "motive" theory that appellant faults his counsel for not eliciting from D.R. (i.e., the theory that Dee and *Gabriale* fabricated the story for R.R. to use because they were mad at appellant) does not square with appellant's earlier complaint that his counsel did not elicit from *Gabriale* evidence about a different theory (i.e., the theory that *R.R.* fabricated the story because she was mad at appellant for sending her home).

Both Gabriale and D.R. did testify about the circumstances surrounding R.R.'s writing a retraction of her accusations against appellant, and were permitted to testify that R.R. was solely was responsible for the contents of that letter. Questions to both of them about *why* R.R. wrote the retraction drew hearsay objections, which the trial court sustained.

We do not second-guess counsel's decision about what testimony to elicit with regard to R.R.'s motive. *See, e.g., Stults v. State*, 23 S.W.3d 198, 208 & n.6

27

(Tex. App.—Houston [14th Dist.] 2000, pet. ref'd) ("[C]ounsel may have elected not to elicit certain testimony or utilize the documentation the appellant prepared because counsel determined that it would not have advanced the appellant's position."). The jury's heard testimony about (1) R.R. being angry that appellant sent her home and about that giving her a motive to lie, and (2) about R.R. retracting her accusations against appellant. Assuming an attempt to elicit from D.R. that Dee and Gabriele told R.R. to lie could survive a hearsay objection, appellant cannot show that, "taking into account the totality of the evidence," but for the jury's failure to hear that testimony, "there is a reasonable probability" that "the result of the proceeding would have been different." *Ex Parte Martinez*, 330 S.W.3d 891, 900–01 (Tex. Crim. App. 2011). The trial court did not abuse its discretion in failing to grant a new trial on this point.

### c. material witnesses

Appellant next argues that counsel was ineffective for "failing to secure the presence of material witnesses to testify at the trial." Appellant's counsel's affidavit states that he did issue subpoenas for the first trial setting and the material witnesses appeared and were sworn to return at each setting.

Appellant specifically complains about the lack of testimony by Dorothy, Ja'Shone, Jacquette, Clydell, Makayla, and Juanita. We address each in turn.

28

*Dorothy*[4]: Appellant argues that appellant's sister, Dorothy, informed appellant's counsel that Dee had "personally told her that they lied to the police, she was on drugs, and they made all of this up." Appellant claims Dee told Dorothy that she wanted to go change her statement to police, but she did not want to get into trouble.

As we noted in rejecting appellant's newly-discovered-evidence argument, appellant's counsel states in his affidavit that he interviewed Dorothy and learned that she had "information about the testimony of" Dee. After "carefully questioning" Dorothy, appellant's counsel concluded that "her testimony would only be of value to impeach [Dee's] testimony." Dorothy attended the entire trial, but because Dee did not testify at trial counsel did not call Dorothy. He concluded that Dorothy's "testimony would not be valuable and would, in all likelihood, be severely limited because her information was solely based on hearsay."

*Ja'Shone*: Appellant argues that his counsel should have called Ja'shone to testify about the contents of a written statement that she provided to appellant, who in turn provided it to police. In that statement, she said that she and some friends were at appellant's house when R.R. got upset that appellant would not take her

---

[4]    Appellant's argument here is largely duplicative of his fifth point of error (which we previously rejected), in which he argued that Laverne's potential testimony about Dee wanting to change her statement qualified as newly discovered evidence justifying a new trial.

home.   According to Ja'Shone, R.R. then "paired up" with appellant's "other enemies" to plot R.R.'s false allegation.

Appellant's counsel's affidavit explained that he was aware of Ja'Shone's statement, and that his investigator interviewed Ja'Shone.  During that interview, Ja'Shone told him that "she had not only been present during the time of the offense, but that she was, in fact, in the bed with" R.R., D.R., and appellant. Counsel averred that, based on his conversation with other witnesses, he believed Ja'Shone's statement to be untruthful, so he could not use her testimony at trial.

*Jacquette*: Appellant argues that his counsel should have subpoenaed Jacquette (who was at Juanita's house when R.R. and D.R. arrived shortly after the sexual assault) to testify at trial.  He relies upon two written statements Jacquette gave in which she states that R.R. told her that she did not know who had assaulted her and that she did not know what had happened.  Jacquette also said that R.R. told her not to call the police about her being assaulted because she did not want to get into trouble with her mother.

Appellant's counsel's affidavit explained that he spoke to Juanita about Jacquette and knew that she was a potential witness.  No one had an actual address for Jacquette, although Juanita told counsel that Jacquette was a heavy drug user and could generally be found on a particular street corner.  Counsel's investigator attempted to locate her on that street corner and at other locations that they heard

30

she frequented. Ultimately, based upon his information about her heavy drug use, counsel decided that "her credibility would be severely compromised and her testimony of little or limited value." Based on this determination, as well as his inability to locate her, counsel "decided to proceed without her."

*Clydell*: Appellant argues that counsel should have called appellant's brother, Clydell, to testify based upon a written statement he provided stating that, on December 29, 2011 (four days before the assault), "this young lady" was high on weed and telling people that she did not know who did this to her, and that Clydell saw her come back to appellant's apartment the next two nights.

Appellant's counsel states in his affidavit that he was aware of this statement and that Clydell was in jail at the time of trial. He "had concerns about putting Clydell [] on the stand because he was not actually present for the events and his testimony would have certainly been severely impeached by his criminal history." Counsel was "very concerned that his criminal history would be imputed onto his brother, Raymond Cavitt, by the jury if he were to testify." Because of this, and because he was able to elicit much of the same information from Gabriale and D.R., counsel did not believe—on balance—that Clydell's testimony would be valuable.

*Makayla*: Appellant argues that his counsel should have called Makayla to testify since she gave a statement that R.R. was at appellant's house the day after

31

the incident and wore a pair of appellant's pants. Makyla also stated, presumably referring to R.R., that "I know this person told me and other people one lie after" another. Finally, Makayla stated that she is the mother of one of the kids that stays at appellant's apartment and that her child and other children all say that appellant never "came on to them."

Appellant's counsel states he was aware of this statement, but "believed it was duplicative of other witnesses testimony" and neither he nor his investigator was ever able to locate her. He also stated that, in his judgment, Makayla's testimony "would have been substantially the same as that of" appellant, Gabriale, and D.R. with regard to R.R.'s location the day after the sexual assault.

*Juanita*: Appellant argues that Juanita, as appellant's hospice provider and D.R.'s mother, had important testimony that D.R. told her that R.R. was lying. Appellant also contends that Juanita would have testified that she told R.R. to call the police, but that R.R. did not want to. Finally, appellant states that Juanita could have testified that R.R. "kept changing her story."

Appellant's counsel's affidavit addresses his attempts to get Juanita to trial, and his ultimate decision to proceed without her:

> I considered Juanita an important witness in the case. She appeared at several trial settings and was sworn to return multiple times. Juanita and [D.R.] both appeared in court on Friday before the trial began on Monday and were sworn to return to testify Monday morning. Juanita assured me she would be present, so I was very surprised when she did not appear. I later learned that she had taken a trucking job and

32

had left the state and would not be back for an unknown period of time. Her daughter, [D.R.], likewise did not appear.

After the State rested I wanted to call Juanita and [D.R.] as witnesses, but they were not present, so I went forward with Gabriale and [appellant]. I then asked for, and was a granted a short continuance in trial in order to locate them. The Court's process server made multiple phone calls and spoke with several witnesses and was finally able to contact [D.R.] through Gabriale. [D.R.] was ordered to be in court at 9:00 am, she did not appear, he contacted her again, she promised to appear at 12:00 pm. She did not appear. She was contacted yet again and promised to be present by 3:30 pm, but again did not appear. At that time I requested that the court enter a Writ of Attachment for both Juanita and [D.R.], which the court granted and entered. D.R. finally appeared at 5:00 pm after the jury was released for the day and was taken into custody pursuant to the Writ of Attachment. Juanita was contacted and informed that her daughter was in custody and that she needed to return to Houston immediately. She declined to do so and refused to give a timeline of when she would return. After [D.R.], [appellant] and Gabriale testified, I believed that all of the information I could have elicited from Juanita had been covered. I was concerned that the jury would blame Mr. Cavitt if I were to ask for the case to be further delayed to get her into court and I was unable to give the court any kind of timeline when she might appear. I decided at that point not to call her. I explained this to the court on the record outside the presence of the jury and then rested my case. I believed Mr. Cavitt, [D.R.] and Gabriale had testified well and believed my case to be strong as it was.

In addition to explaining counsel's individual reason for not calling each of these witnesses, counsel's affidavit also explained that he was able to get into evidence that R.R. had recanted her allegations, and that counsel thoroughly cross-examined R.R. about her recanting and about inconsistencies between her testimony and that of other witnesses. He specifically emphasized to the jury that

R.R. claims to have not returned to appellant's apartment in the days following the sexual assault, but other witnesses testified to the contrary.

The State makes several arguments about why the statements relied upon by appellant's motion for new trial in relation to these six potential witnesses above fall short of what is required to demonstrate that the witnesses would have been available to testify and how their testimony would be helpful. *See, e.g., Everage v. State*, 893 S.W.2d 219, 222 (Tex. App.—Houston [1st Dist.] 1995, pet. ref'd) ("[C]ounsel's failure to call such witnesses is irrelevant absent a showing that the witnesses were available and would benefit the defense."). We need not reach the State's arguments about each of these statements because counsel provided the trial court with an explanation of his strategy and reasoning with regard to each of these potential witnesses. "In light of these considerations and the deference we must afford strategic decisions made by trial counsel," appellant has not demonstrated that the trial court abused its discretion in finding that counsel's decisions in this regard did not fall "below an objective standard of reasonableness." *Melancon v. State*, 66 S.W.3d 375, 381 (Tex. App.—Houston [14th Dist.] 2001, pet. ref'd); *see also Perez v. State*, 310 S.W.3d 890, 893 (Tex. Crim. App. 2010) ("For this performance inquiry we consider all of the circumstances, with 'a strong presumption that counsel's conduct [fell] within the wide range of reasonable

professional assistance.'" (quoting *Strickland*, 466 U.S. at 688–89, 104 S. Ct. at 2065)).

## 2. Appellant's Arguments Raised for the First Time on Appeal

It is well settled that ineffective assistance of counsel may be raised without the necessity of a motion for new trial. *See Robinson v. State*, 16 S.W.3d 808, 812–13 (Tex. Crim. App. 2000). Nonetheless, an ineffective assistance of counsel claim must "be firmly frounded in the record." *Scheanette v. State*, 144 S.W.3d 503, 510 (Tex. Crim. App. 2004).

Trial counsel should ordinarily be afforded an opportunity to explain his actions before being denounced as ineffective. *Rylander v. State*, 101 S.W.3d 107, 111 (Tex. Crim. App. 2003). There is a presumption that counsel's conduct falls within the wide range of reasonable professional assistance, and counsel's performance will be found deficient only if the conduct is so outrageous that no competent attorney would have engaged in it. *Andrews v. State*, 159 S.W.3d 98, 101 (Tex. Crim. App. 2005).

### a. revealing to venire how long appellant had been in jail

During voir dire, Venireperson No. 51 (a prosecutor), stated that he is "just against a criminal regardless." Later, that same venireperson asked appellant's counsel directly how long appellant had been in jail, and appellant's counsel responded that he had been in jail for 542 days. Venireperson No. 51 then declared

that appellant must be guilty, or else why "is it taking him so long to get the evidence or whatever and get it lined out and get him out of there."

Appellant's counsel took that opportunity to inform the jury that he was actually ready to go to trial 90 days after appellant's arrest, and counsel immediately led the discussion back to an admonishment that appellant is "not guilty," by default regardless of how long he has been in jail because he is presumed innocent. Venireperson No. 51 was ultimately stricken for cause by agreement of the parties and court based upon his representation that he could not be fair in a criminal case.

Appellant argues that his counsel's revealing that he had been in jail for 542 is analogous to requiring appellant to appear before the jury in prison garb, implying that he was guilty. The State responds by pointing out that counsel effectively conveyed to the venire panel that the delay was the State's fault. The State also argues that there were potential strategic reasons for answering Venireperson No. 51's direct question about how long appellant had been in jail, "namely, to avoid appearing rude or evasive when asked a direct question, to discover venire members with a bias against the law, to imply that the appellant had been treated unfairly by the State, [or] to show that it took the State a very long time to get its evidence together."

We agree with the State that appellant has not shown counsel's divulging how long appellant had been in jail violates his right to be presumed innocent or constitutes "conduct is so outrageous that no competent attorney would have engaged in it." *Andrews*, 159 S.W.3d at 101.

### b. Failing to object to Venireperson No. 39

During voir dire, appellant's counsel queried the venire panel about the impact prior convictions would have on their ability to be impartial.

> VENIREPERSON: Like the previous two are saying, if the person has a history of the similar crime and their testimony is not credible in my eyes.
>
> DEFENSE COUNSEL: Okay. You're saying if it's the same kind of pattern crime or something close, then his testimony would not be credible at all?
>
> VENIREPERSON: No.
>
> DEFENSE COUNSEL: And you couldn't render a fair and impartial verdict. Is that right?
>
> VENIREPERSON: That's hard to say that.
>
> MR. GIFFORD: And your number?
>
> VENIREPERSON: 39.

Without further questioning on his ability to be impartial, Venireperson No. 39 was ultimately empaneled to serve on the jury. Appellant argues that because his prior conviction for sexual assault was revealed during the guilt-innocence stage of the trial, he was deprived of a fair and impartial jury because counsel failed to challenge Venireperson No. 39 for cause.

37

The State's response is two-fold. First, it contends that the transcript is confusing because No. 39's "no" answer to "then his testimony would not be credible at all?" is ambiguous. Also, the State argues, the answer "That's hard to say that" in response to "you couldn't render a fair and impartial verdict. Is that right?" is insubstantial.

Second, the State contends that we cannot speculate about counsel's strategy because this complaint was not raised in a motion for new trial, so counsel was not able to respond. "Where the record [is silent as to] trial counsel's reason for failing to challenge or strike a particular veniremember, we must indulge the presumption that counsel's performance was adequate." *McCoy v. State*, 996 S.W.2d 896, 900 (Tex. App.—Houston [14th Dist.] 1999, pet. ref'd) (quoting *Hardin v. State*, 951 S.W.2d 208, 2011 (Tex. App.—Houston [14th Dist.] 1997, no pet.)). Especially here, where the venireperson's statements are not clear and we have not heard from counsel on this issue, we will not speculate to find ineffective assistance.

### c. failing to object to testimony regarding appellant's likelihood of reoffending during the guilt-innocence stage of trial

Appellant next argues that his counsel should have objected to the testimony of Lawrence Thompson, the director of therapy and psychological services at the Harris County Children's Assessment Center. During Thompson's testimony, the State approached the bench and told the court, "There was some testimony earlier

that the defendant has a prior sexual case. And, so, I was going to ask the witness about patterns of behavior with regard to people who reoffend in sexual abuse cases." Defense counsel responded that "he needs to make sure he couches it abuse as to what, an adult or a child or whatever[;] because if we have no report of any prior children, this is a child clinical psychologist." The State then elicited testimony that, "to the extent that there is an inappropriate sexual attraction to children, that inappropriate sexual attraction is there and is an issue in an ongoing way." Thompson further explained that, in the context of behaviors, it depends on the particular perpetrator whether they reoffend, but the attraction cannot be cured.

Appellant cites Texas Rule of Evidence 702 for the standards for admission of expert testimony, and notes that the trial court determination regarding experts' qualifications and the admissibility of expert testimony is reviewed for abuse of discretion. As the State points out in its brief, appellant does not state what allegedly renders Thompson's testimony inadmissible; indeed, appellant cites no authority demonstrating that this testimony was improper and that any such Rule 702 objection to Thompson's testimony would have been successful.

Appellant complains that his counsel should have objected to Thompson's testimony under Texas Rule of Evidence 403 because "any probative value was substantially outweighed by the danger of unfair prejudice." Again, however, appellant offers no argument or authority in support.

39

Appellant has not carried his burden of establishing that his counsel failed to make an objection, "that the trial judge would have committed error in overruling the objection," and that "the jury would have reached a different conclusion" in the absence of this testimony. *Ex Parte White*, 160 S.W.3d 46, 53–54 (Tex. Crim. App. 2004).

### d. introducing testimony about appellant's prior convictions and failing to obtain a ruling regarding the admissibility of these prior conviction

The State filed a notice of intent to use evidence of prior convictions and extraneous offenses, including (1) 1987 forgery conviction, (2) 1989 sexual assault conviction, (3) 1989 unlawfully carrying weapon conviction, (4) 2007 theft conviction, (5) 2007 robbery conviction, (6) 2007 sexual assault allegations, and (7) 2010 sexual assault allegations. During direct examination of appellant, appellant's counsel elicited testimony about three prior convictions for which he served prison sentences, namely, accessory to robbery in the early 1970s (served 18 years), forgery in 1986 (served 6 months before conviction was reversed[5]), and sexual assault in 1989 (served 17 years). Appellant's counsel also elicited testimony that appellant pleaded guilty to the prior accessory-to-robbery charge and the sexual-assault charge because he was guilty in those cases, but that he insisted on a trial in this case because he is not guilty here.

---

[5] The State disputes that this forgery conviction was reversed.

Appellant acknowledges that eliciting testimony for a defendant as to his own prior convictions can be a matter of sound trial strategy if those prior convictions are admissible. *Martin v. State*, 265 S.W.3d 435, 443 (Tex. App.—Houston [1st Dist.] 2007, no pet.). He contends, however, that if prior convictions are inadmissible, there can be no reasonable trial strategy for introducing them. He argues that the convictions his counsel elicited his testimony about are too remote to be admissible and, thus, his counsel was ineffective by soliciting his testimony as to these convictions.

The State responds that we should reject appellant's argument in light of his failure to raise this issue in his motion for new trial. *Thompson*, 9 S.W.3d at 814–15 (reiterating "strong presumption that counsel performed within reasonable standards"). The State also argues that it is not clear that counsel was actually attempting to elicit testimony about the forgery conviction when he asked, after appellant discussed his accessory-to-robbery conviction: "And then you messed up again and went to prison; is that correct?" The State points out that after appellant answered with information about his forgery conviction, counsel elicited testimony from him about no longer having a conviction for that crime on his record because it had been reversed. Counsel then inquired, "Now, did you then go to prison again?" That question elicited a response about appellant's sexual-assault conviction. The State argues that we cannot know if counsel was trying to elicit

41

information on the forgery conviction or sexual-assault conviction when he questioned appellant about whether he had been back to prison after being released from his accessory-to-robbery sentence. Finally, the State asserts that (1) the concept of "tacking" recognizes that subsequent convictions for felonies or misdemeanors involving moral turpitude can render admissible convictions more than ten years old because such intervening convictions demonstrate a general disrespect for the law, and (2) counsel made strategic use of appellant's prior convictions.

Evidence of certain previous convictions for felonies and crimes of moral turpitude is admissible under the Texas Rules of Evidence:

> **(a) General Rule.** For the purpose of attacking the credibility of a witness, evidence that the witness has been convicted of a crime shall be admitted if elicited from the witness or established by public record but only if the crime was a felony or involved moral turpitude, regardless of punishment, and the court determines that the probative value of admitting this evidence outweighs its prejudicial effect to a party.
>
> **(b) Time Limit.** Evidence of a conviction under this rule is not admissible if a period of more than ten years has elapsed since the date of the conviction or of the release of the witness from the confinement imposed for that conviction, whichever is the later date, unless the court determines, in the interests of justice, that the probative value of the conviction supported by specific facts and circumstances substantially outweighs its prejudicial effect.

TEX. R. EVID. 609.

Although a conviction that is more than 10 years' old is deemed remote under Rule 609 (thereby placing a higher burden on the State to demonstrate admissibility), this Court has recognized that "subsequent convictions for felonies or misdemeanors involving moral turpitude may remove any taint of remoteness from prior convictions." *Davis v. State*, 259 S.W.3d 778, 781 (Tex. App.—Houston [1st Dist.] 2007, pet. ref'd); *Rodriguez v. State*, 129 S.W.3d 551, 559 (Tex. App.— Houston [1st Dist.] 2003, pet. ref'd) ("A misdemeanor theft conviction is a crime involving moral turpitude, and, therefore, it can be 'tacked onto' remote convictions and cause them to be treated as not remote under Rule 609(a)."); *Hernandez v. State*, 976 S.W.2d 753, 755 (Tex. App.–Houston [1st Dist.] 1998) ("[T]he 'tacking' of the intervening convictions causes a conviction older than 10 years to be treated as not remote."), *pet. ref'd*, 980 S.W.2d 652 (Tex. Crim. App. 1998).

In *Theus v. State*, the Court of Criminal Appeals set out a non-exclusive list of factors that courts should consider when determining whether the probative value of a prior conviction outweighs its prejudicial effect under Rule 609(a). 845 S.W.2d 874, 880–81 (Tex. Crim. App. 1992); *Davis*, 259 S.W.3d at 782. These factors include: (1) the impeachment value of the prior crime; (2) the temporal proximity of the past crime relative to the charged offense and the witness's subsequent criminal history; (3) the similarity between the past crime and the

charged offense; (4) the importance of the defendant's testimony; and (5) the importance of the credibility issue. *Theus*, 845 S.W.2d at 880–81; *Davis*, 259 S.W.3d at 782. The party seeking to introduce evidence of prior convictions pursuant to Rule 609 bears the burden of demonstrating that the probative value of the prior conviction outweighs its prejudicial effect. *Theus*, 845 S.W.2d at 880; *Davis*, 259 S.W.3d at 782.

The State argues that appellant has failed to carry his burden of demonstrating that the trial court would have abused its discretion by admitting evidence of appellant's three prior convictions, a threshold for finding ineffective assistance of counsel under *Strickland*. *See Davis*, 259 S.W.3d at 780 (quoting *Theus*, 845 S.W.2d at 881) ("A trial court abuses its 'wide discretion' when its decision to admit a prior conviction lies outside the zone of reasonable disagreement."). Applying the *Theus* factors, we agree with the State.

As for the first factor, both appellant and the State agree that a prior forgery conviction carries a high impeachment value because it involves deception, but that the impeachment value of the accessory-to-robbery and sexual-assault convictions are low. The second *Theus* factor mitigates in favor of admitting all three convictions, as they show appellant's long-term propensity for breaking the

law.[6] The third *Theus* factor weighs in favor of admitting the accessory-to-robbery and forgery convictions because they are dissimilar to the charged crime here, and weighs against admitting the sexual-assault conviction because of its similarity to the charged offense. Finally, application of both the fourth and fifth *Theus* factors weigh heavily in favor of admissibility of all the prior convictions because only appellant and R.R. can provide testimony about what actually happened.

Applying these factors in the context of an ineffective-assistance-of-counsel claim demonstrates that appellant cannot carry his burden of proving his counsel was ineffective by eliciting testimony about his prior convictions. Going into appellant's direct examination, appellant's counsel had reason to believe—based on the State's notice of intention to use evidence of prior convictions and extraneous offenses—that the State would introduce evidence of at least five prior convictions ranging from 1987 to 2007, as well as two other incidents of sexual assault between 2007 and 2010. We are not privy to counsel's strategy about how to tackle, on direct examination, appellant's long criminal history. Given that less than 10 years have passed since appellant was released on the 1989 sexual-assault conviction, as well as the *Theus* factors weighing in favor of its admission, appellant has not demonstrated that the trial court would have abused its discretion

---

[6] While appellant emphasizes that his accessory-to-robbery conviction was 40 years old at the time of trial, appellant's testimony confirmed that he had been in prison for approximately 35 ½ of those 40 years for various felony convictions.

45

by refusing to exclude that testimony under Rule 609; nor has he shown that no reasonable counsel would have believed the sexual-assault conviction would ultimately be admitted and thus make the strategic decision to elicit testimony frpm appellant about it.

As for the forgery conviction, we agree with the State that it is not at all clear from the record that appellant's counsel was attempting to elicit information about the forgery conviction, rather that the sexual-assault conviction, when he asked appellant about whether he "messed up again." In any event, whether this testimony was accurate or not, appellant was permitted to testify that his forgery conviction had been reversed, lessening the taint before the jury.

The accessory-to-robbery conviction is 40 years old, and appellant was released from confinement on that charge more than 20 years ago. We do not know counsel's strategy, if any, in eliciting testimony about that conviction as opposed to others. Nonetheless, heeding our responsibility "to be highly deferential to trial counsel and avoid the deleterious effects of hindsight," we are mindful that counsel made decisions about what prior convictions to pursue with good reason to believe that the State would admit evidence about so many prior convictions and extraneous bad acts that tacking would likely come into play to render this oldest conviction "not remote." *See Campos v. State*, __ S.W.3d __, __, 2015 WL 162123, at *17 (Tex. App.—Houston [1st Dist.] January 13, 2015, no

pet.) (recognizing that, "[u]nder the 'tacking' doctrine, a subsequent conviction for a felony or a misdemeanor involving moral turpitude 'may remove any taint of remoteness from prior convictions.'"). Given that counsel had reason to believe that his strategy for dealing with prior convictions needed to take into account the likelihood that several prior convictions would be admitted, his decision to elicit testimony about the accessory-to-robbery conviction was not so outside the zone reasonable disagreement as to render his assistance ineffective. *Theus*, 845 S.W.2d at 881.

### e. details about appellant's prior convictions

Relatedly, appellant argues that his counsel was ineffective for (1) eliciting inadmissible details about his prior offenses, and (2) failing to object to the State's eliciting details about appellant's prior offenses.

During his direct examination, appellant's counsel elicited from him information about the length of his prior sentences for accessory to robbery, forgery, and sexual assault. During the State's cross-examination, appellant's counsel did not object when the State elicited testimony that appellant's prior sexual assault conviction involved an 18-year-old female complainant. Appellant contends that even though prior convictions may be admissible, these details about those convictions generally are not. *See, e.g.*, *Lape v. State*, 893 S.W.2d 949, 958 (Tex. App.—Houston [14th Dist.] 1994, pet. ref'd). Appellant has not, however,

47

demonstrated that even if these details exceeded what is generally admissible, there is a "reasonable probability that the jury, in light of all the evidence presented, would have reached a different conclusion" absent that evidence.

We overrule appellant's first issue.

## CONCLUSION

We affirm the trial court's judgment.

Sherry Radack
Chief Justice

Panel consists of Chief Justice Radack and Justices Brown and Lloyd.

Publish. TEX. R. APP. P. 47.2(b).